ALFRED A. EICKS, Administrator of Estate of HENRY A. EICKS, v. FIDELITY & CASUALTY COMPANY OF NEW YORK, Appellant.

Division One, July 31, 1923.

1. **ACCIDENT INSURANCE: Renewal: Separate Contract.** A renewal of an indemnity bond or accident insurance policy is a separate and distinct contract, but with the same terms and conditions as those contained in the policy which is renewed.

2. ————: **Renewal Receipt: In Itself a Mere Offer: Acceptance.** The delivery by the insurer of a renewal receipt to the insured, without a request therefor from the insured, is an offer or proposal to renew or continue the policy, which must be accepted by the insured in order for the contract of insurance to continue effective. But his acceptance or assent to such renewal need not be made in express or formal terms. It may be manifested by acts, or by a long established course of dealing from which the intention of both parties to renew may be inferred.

3. ————: ————: **Acceptance: Inferable from Facts.** Proof that the insurer issued its policy more than two years prior to the insured's death; that at the time of its issue he had been the holder of a similar policy in the same company for ten years, which was then surrendered; that he was customarily slow in paying the semi-annual renewal premiums on both policies, usually paying after the date for payment fixed by the contract, sometimes a considerable time after such date, and on one occasion not until the next succeeding premium was almost due; that he never at any time formally signified his acceptance of any renewal certificate except by making the belated payments therefor; that two days before the renewal date expired the company, without any directions or request from him and without actually having received the renewal premium, mailed him a duly executed renewal certificate continuing the policy in force for six months, the intention being to give him credit for the premium due if he elected to continue the policy in force; that the insured at no time after receiving the renewal certificate communicated with the company, and did not pay the renewal premium or any part of it; that he was killed fifty-four days after the premium was due, and the renewal certificate was found among his valuable papers after his death, is sufficient evidence from which the trier of the fact may infer that the insured accepted the company's offer to renew the policy.

4. ———: ———: **Uncommunicated Acceptance.** Acceptance of an offer may be by acts as well as by formal letter. Any appropriate act by which the terms of the proposal were intended to be accepted will bind both parties.

5. ———: ———: ———: **Long Established Course of Dealing.** For more than ten years the company had continued the insured's policy in force, although he customarily did not pay the premium when due, and often not for months afterwards, and two days before the last renewal date before his death the company sent him an unconditional renewal certificate continuing the policy in force, and the letter accompanying it contained no request for payment or warning against delay. Prior to that time the policy had been regularly continued in force, notwithstanding the payments were never timely made, acceptance being implied from his retention of the certificates and recognized by both parties. He died fifty-four days after the renewal date without having paid the premium or returned the certificate or in any wise informed the company that he had received it, and it was found among his valuable papers after his death. *Held*, that it was intention of both parties, established by this long-established course of dealing, that the renewal contract was to go into effect immediately upon the delivery of the renewal certificate and to continue in force for the renewal period, and there was an actual acceptance of the renewal contract by the insured, and a formal written acceptance communicated to the company was not necessary to make the contract binding on both parties from the premium-payment date to the end of the renewal period, no such formal acceptance being contemplated.

6. ———: **Accidental Means: Unexpected Assault.** An injury received by the insured in an unexpected and unforeseen assault upon him is one effected through accidental means, although the insured at the time he received the injury was threatening and advancing towards his assailant, who suddenly picked up a mop and quickly struck him, killing him, though not intending to do so. There is no real distinction between "accident" and "accidental means;" nor can it be held that an injury which is the unforeseen and unexpected result of an intended act is not an injury sustained or effected through accidental means.

Appeal from St. Louis City Circuit Court.—*Hon. Benjamin J. Klene*, Judge.

A̶FFIRMED.

*Jones, Hocker, Sullivan & Angert* for appellant.

(1)  The renewal of an accident policy is a new contract of insurance for the period specified in such renewal.  Long Bros. Grocery Co. v. Guaranty Co., 130 Mo. App. 421; Commercial Bank v. Bonding Co., 194 Mo. App. 224; Slokel v. Heywood, 1 Chanc. Div. 459; Hodgson v. Accident Assn., 166 N. Y. Supp. 293.  (a) The delivery of a renewal receipt by the insurer to the insured upon the expiration of the policy was a mere offer or proposal to renew or continue the insurance in force, which could only ripen into a contract by the insured's acceptance of such offer.  Equitable Life Co. v. Robertson, 191 S. W. 989; Pacific Ins. Co. v. Vogel, 232 Fed. 340; Browner v. Royal Ind. Co., 246 Fed. 637; Grogan v. Travelers Ins. Co., 139 Pac. 1047; Harper v. Ins. Co., 64 S. E. 567; Penn. Fire Ins. Co. v. Sorrells, 98 S. E. 358.  (b)  And such acceptance must be a communicated acceptance; a mere mental determination to accept will not suffice.  Lungstrass v. Ins. Co., 48 Mo. 204; Horton v. Ins. Co., 151 Mo. 620; 6 R. C. L. p. 606. (2)  An injury received by the insured in an assault upon another is not an injury effected through accidental means.  Hutton v. Ins. Co., 108 N. E. 296; Gaines v. Fidelity & Cas. Co., 111 App. Div. (N. Y.) 386; Taliaferro v. Travelers Ins. Co., 80 Fed. 367; Carnes v. Traveling Men's Assn., 106 Iowa, 281; Rock v. Travelers Ins. Co., 172 Cal. 462; L. R. A. 1915 E. 127, note.

*Henry G. Trieseler* and *Frederick H. Bacon* for respondent.

(1)  Because of the course of dealing between the parties formal acceptance of the renewal receipt was unnecessary.  (a)  It is immaterial whether or not a renewal of a policy of accident insurance is the making of a new contract or not because the course of dealing between the parties is of controlling importance.  The

authorities cited by appellant are not in point for the reason that they ignore the course of dealing between the parties. (b) The unconditional delivery of the renewal receipt with the intent to give credit according to custom made formal acceptance unnecessary. Jones v. Life Ins. Co., 168 Mass. 245; Brooklyn Life Ins. Co. v. Miller, 12 Wall. 285; Washburn v. Casualty Co., 106 Me. 481; Washburn v. Casualty Co., 108 Me. 429; Fidelity Co. v. Willey, 80 Fed. 500; Gray v. Stone, 143 S. W. 114; Robertson v. Mut. Life Ins. Co., 123 Mo. App. 247; Isaacs v. Equitable Life Co., 186 N. Y. Supp. 854. (2) The unconditional delivery of the renewal receipt according to the usual custom with the intent to grant credit for the premium estops the company from claiming that the contract sued on was not in force at the time of the death of Eicks. 6 Cooley's Briefs (Supp.) sec. 509 (g); Berryman v. Southern Surety Co., 227 S. W. 100; DeGroot v. Mut. Life Ins. Co., 190 N. W. 443. (3) The company is further estopped because in denying liability it placed such denial on grounds other than that the policy was not in force at the time of the death of Eicks. Dezell v. Fid. & Cas. Co., 176 Mo. 274; Shearlock v. Mut. Life Ins. Co., 193 Mo. App. 438; Hay v. Bankers Life Co., 231 S. W. 1035. (4) The death of Eicks was one caused by accidental means. Under the authorities followed in this State no distinction is made between death by accident and one by accidental means. Young v. Ry. Mail Assn., 126 Mo. App. 341; Lovelace v. Travelers' Prot. Assn., 126 Mo. 104, 30 L. R. A. 209, and note; American Acc. Co. v. Carson, 79 Ky. 445, 34 L. R. A. 302; Campbell v. Fidelity & Cas. Co., 109 Ky. 670; Feder v. Travelling Men's Assn., 107 Iowa, 540, 43 L. R. A. 694; Phoenix Acc. Assn. v. Stiver, 42 Ind. App. 641; Schreiner v. High Court, 35 Ill. App. 576; Collins v. Fid. & Cas. Co., 63 Mo. App. 256; Withers v. Ins. Co., 193 Pac. 566; Harper's Admr. v. Phoenix Ins. Co., 19 Mo. 509; Lewis v. Ocean Acct. Corp., 224 N. Y. 18, 7 A. L. R. 1129; Summers v. Fidelity Aid Assn., 84 Mo.

App. 605; Atlanta Acct. Assn. v. Alexander, 104 Ga. 709, 42 L. R. A. 188; General Acct. Corp. v. Meredith, 141 Ky. 92; United States Cas. Co. v. Griffis, 186 Ind. 126, L. R. A. 1917F, 481; Rody v. Travelers' Ins. Co., 3 N. M. 543, 9 Pac. 348; Pickett v. Pacific Ins. Co., 144 Pa. 79, 27 Am. St. 618; Nax v. Travelers' Ins. Co., 130 Fed. 985; Rowe v. U. Comm. Travelers, 4 A. L. R. 1235, 172 N. W. 454; Aetna Ins. Co. v. Little, 146 Ark. 70, 225 S. W. 298. (5) Ostermann was guilty of manslaughter, if not murder, for he made no effort to avoid Eicks or retreat. State v. Gordon, 191 Mo. 125; State v. Fraga, 199 Mo. 134.

LINDSAY, C.—Plaintiff's suit is based upon an alleged semi-annual renewal, made on March 5, 1920, by defendant, of a certain policy of accident insurance, extending and continuing said policy in force from March 7, 1920, to September 7, 1920; and upon provisions therein that if, while said policy or the certificates of renewal of the same were in force, the insured, Henry A. Eicks, should come to his death through accidental means and resulting directly, independently and exclusively of all other causes, the defendant should pay to his estate the sum of eight thousand dollars. The petition charging that on the 31st day of May, 1920, while said policy and the certificate of renewal thereof was in force, said Henry A. Eicks came to his death through accidental means resulting directly, independently and exclusively of all other causes, by an accidental blow on the head resulting in a fractured skull, from which he died within twenty-four hours thereafter. The petition alleged compliance by deceased and plaintiff with the conditions of the policy, and set forth the facts as to the giving of notice of the death of the assured, and the making and delivery to defendant of proofs of his death. The answer was a general denial, followed by a special denial that defendant had entered into any contract or agreement with Henry A. Eicks renewing or continuing in force said policy to any time beyond March 7, 1920.

The parties waived a jury and submitted the cause to the court upon an agreed statement of facts, which also defined the issues involved, and stipulated that no point was made as to the sufficiency of the pleadings to raise every question of law involved in the case. In the statement, Henry A. Eicks is referred to as the insured, and the defendant is referred to as the company. The portions necessary to an understanding of the issues are set out.

"2. At all times hereinafter referred to the defendant maintained an office in the city of St. Louis, the representatives of the company at which had all the powers possessed by the company with respect to executing and delivering policies of insurance, such as that hereinafter referred to, as well as with respect to extending time for payment of premiums and granting credit for the payment of premiums on such policies.

"3. On March 7, 1918, the company by its St. Louis office issued and delivered to the insured its policy No. 4532626, a true copy of which is attached hereto, marked 'Exhibit A.' A copy of the application of the insured for this policy is attached hereto, marked 'Exhibit B.' The premium on this policy was $20 for each term of six months, as therein appears. The insured had been the holder of a similar policy issued by the company, dated October 16, 1908, and 'Exhibit A' was issued to take the place of this prior policy, and the latter was surrendered by the insured to the company for cancellation when 'Exhibit A' was issued and delivered.

"4. The insured paid the semi-annual premium on the policy identified as 'Exhibit A' from the date of its issuance up to and including the premium payable September 7, 1919. The insured was customarily slow in making his payments. He usually paid after the date fixed for payment by the contract, and sometimes paid some considerable time after this date. On one or more occasions he made his payment in installments. On one occasion he waited almost until the next succeeding

premium was payable before making payment of the preceding one. He never at any time formally signified his acceptance of any of the renewal certificates hereinafter referred to, except by paying the premium called for in the respective renewal certificates in the manner and to the extent hereinafter stated.''

The last three transactions between the insured and the company with respect to this insurance are severally and respectively set out in paragraphs 5, 6 and 7 of the statement, but except for the dates they are identical in character and terms used. Paragraphs 5 and 6 recite the transactions for the six-months periods, beginning March 7, 1919, and beginning September 7, 1919. Paragraph 7 in like terms recites the last transaction for the six-months period directly in issue, beginning March 7, 1920, as follows:

''7.     On March 5, 1920, the St. Louis office of the company, by a representative having authority in the premises, sent by mail to the insured, in St. Louis, a letter, a copy of which is hereunto attached, marked 'Exhibit C.' Enclosed with this letter was a renewal certificate duly executed by the proper officers of the company, and a copy of which is hereto attached, marked 'Exhibit H.' This letter and document were sent by the company to the insured, without any previous directions or request from him, and without having actually received the premium referred to in the renewal certificate. The intention of the company at the time in sending this letter and document was to give the insured credit for the premium falling due March 7, 1920, if the insured elected to continue the policy in force. This communication and the enclosed document were duly received by the insured through the mails. At no time after the receipt of this communication did the insured answer this communication or communicate with the company or any representative thereof in any way respecting this insurance or the premium payable March 7, 1920. This premium was never paid to the company or any of its

representatives by the insured or by any other person, in whole or in part. This renewal certificate was found after the death of the insured in his safe, among his valuable papers.

"8. The insured died May 31, 1920, from the effects of being struck by a heavy pushbroom or mop in the hands of Charles E. Osterman. Said Osterman and the insured each had places of business in the city of St. Louis which abutted upon the same alley, in close contiguity to each other. In January, 1920, some differences arose between Osterman and the insured, out of which arose hard feelings between them. The insured was a blacksmith by trade, and was a large, muscular, strong man (of an irritable and gruff disposition). His disposition in that respect was known to Osterman. When Osterman struck the insured with the pushbroom or mop, he had no intention of killing him, but merely intended to defend himself. With this preliminary explanation, the parties to this cause insert herein the testimony of one John W. Grundorf at the Coroner's inquest held on the body of the insured, and agreed that this testimony correctly relates the circumstances attending the death of the insured."

This testimony is as follows:

"Q. What do you know about the injury received by Henry A. Eicks? A. Yesterday morning I called up Mr. Osterman and told him I wanted to see him about some business; he is in the real estate business, and I wanted to go over and have a talk with him, so I called him on the 'phone, and I said, 'I will be over there in a little while.' So I went over and talked about this matter that I wanted to go over with him, and during that conversation Mr. Eicks came out of his back gate, and he accused Mr. Osterman of taking his garbage box, and Mr. Osterman says, 'Mr. Eicks, I haven't got your garbage box. You have got your garbage box.' Mr. Osterman said, 'I haven't got your garbage box; I don't know where it is.' Mr. Eicks says, 'You wanted the

wood, and you knocked it apart,' and Mr. Osterman says, 'If you can find that wood you can have it; I don't know where your garbage box is,' and Mr. Eicks all the time was coming kind of close to Mr. Osterman. I was standing there at the time, and then Eicks turned to him again and he says. 'You have been interfering too much with this business back here of mine, and if you don't quit that damn business I'm going to break your head for you.' Eicks kind of walked away for a minute, and then he walked back again, and Mr. Osterman says, 'You aren't going to break anybody's head,' and then with that Eicks came much closer, and he says, 'If you don't quit interfering with my business I'll break your darn head for you,' and with that Osterman picks up the broom, and it was done so quick; the broom was laying there when Eicks came to Osterman; I stood right there, side by side with Osterman, kind of facing east, but I seen Mr. Osterman made a move to hit towards Eicks, but I didn't see the blow struck, and as I turned around Eicks fell, and the broom flew out of Mr. Osterman's hands, and he run to Eicks and lifted up his head, and he says, 'Oh, Mr. Eicks, are you bad hurt?' and he says, 'You stay here,' and there was a lady came out with a pillow, and we put the pillow under his head while he ran for the doctor. When Dr. Passler came he examined his pulse and he says he would be all right, he thought he would be all right, and with that Mr. Osterman says, 'Let's carry him inside of the yard,' and they picked him up and carried him in the yard and laid him on a seat and they got him a glass of water, and he drank the water and that seemed to kind of revive him.''

Further testimony of this witness is set out at some length, but it does not show that Eicks actually struck Osterman, but that he was making some moves with his hands, appeared very angry, and at or just before Osterman struck him was moving somewhat quickly toward the latter. The broom or mop was lying in the alley where the men were at the time, and Osterman picked it

up quickly and struck the blow. The witness on his cross-examination stated that Eicks advanced three times, and that twice he made to Osterman a threat to break his damn head. The insured died on May 31, 1920, the day on which he was struck.

On June 5, 1920, plaintiff qualified as administrator, and on the 11th notified defendant of the death of the insured and applied for blanks to make proofs. On the 21st day of June, blanks were forwarded to him with a letter from the company's examiner. The body of the letter is as follows:

"Herewith in response to your demand, blanks asked for in connection with claim under policy of Henry A. Eicks, deceased, under the conditions set forth below.

"These blanks are submitted under a strict reservation of all rights and defense of the company in respect to the coverage of the policy in any respect and with the express understanding that by submitting these blanks for your use the company does not waive any of the provisions of the policy of any sort or any of the defenses which the company had, has or may have. You will notice a reservation and non-waiver substantially along these lines at the top of the blanks."

The non-waiver notice on the blank furnished to plaintiff and referred to in said letter is set forth, and was to the effect that furnishing the blank the company did not admit liability for any claim made or to be made, and did not waive any right or defense it then had or thereafter might have. The agreed statement then continues:

"Upon the blanks sent with the letter last referred to, the plaintiff made out and delivered proofs of death to the company which are admitted to have been in proper form, and delivered in due time. It is also admitted that the notice of the death of the insured was given within sufficient time. The expense of the plaintiff in having these proofs made out was $5."

The renewal receipt here in issue is as follows:

## "EXHIBIT H.

"S. Valuable: Do Not Destroy or Mislay. Accident Department.

"The Fidelity and Casualty Company of New York Home Office; 92 Liberty Street, New York City.

"Renewal Number 9531676          Premium $20.00

"Certificate Continuing in Force Policy No. 4532406
        Name of Assured Henry A. Eicks.

"The Fidelity and Casualty Company of New York, in consideration of a premium of twenty and 0⁰/₁₀₀ dollars, does hereby continue in force the said policy from noon of the 7th day of March, 1920, to noon of the 7th day of September, 1920, standard time at the place of the assured's address designated in the said policy; provided that the assured upon the date first mentioned above is in sound condition, mentally and physically, except as stated in the policy, and that the said policy has not terminated or been canceled prior to the said date first mentioned above. But this certificate shall not be binding upon the company until countersigned by a duly authorized representative of the company.

"R. A. HOFFMAN,
                        Gen. Agt.
        "ROB'T J. HILLAS,
                        President.

"AC 776
    (190317387).
        "Countersigned A. G. BAARE.
"THEO. E. GATY,

    "Vice-President-Secretary."

And the letter in which the receipt was transmitted is as follows:

"EXHIBIT G.

March 5, 1920

"Mr. Hy. A. Eicks,
  "15th & Cass Ave,
    "City,

"Dear Henry,

"Enclosed herewith find renewal certificate extending your accident insurance for the ensuing six months.

"Thanking you for your continued patronage and with kind personal regards, I am,

"Yours very truly,
  "H. E. HANKER."

The receipt and letter set forth except for difference in dates, are in the exact form of those sent September, 1919, and March, 1919.

Upon the facts set forth in the statement and exhibits therein referred to the parties further stipulated:

"10. It is agreed that if, upon these facts, said policy was in force at the time of the death of the insured, or if the company is estopped from denying that it was in force, and if the death of the insured resulted from bodily injuries sustained through accidental means, directly and independently and exclusively of all other causes, within the meaning of the policy, then judgment shall be entered for the plaintiff for eight thousand dollars ($8,000) with interest thereon from September 2, 1920, at six per cent (6%) per annum.

On the other hand, if on these facts the policy was not in force and the company is not estopped to assert that it was not in force, or if on these facts the death of the insured occurred under such circumstances as not to be covered by the policy, then judgment shall be entered for the defendant."

"11. With respect to damages and attorney's fees, it is stipulated between the parties that at the time, as shown in the foregoing correspondence, that plaintiff made proofs and demanded payment, the company was cognizant of all of the facts herein set forth.

"It is further stipulated that if plaintiff is entitled

to a recovery, of attorneys' fees, a reasonable attorneys' fee for representing the plaintiff in the prosecution of this action is one thousand dollars ($1,000)."

The court found in favor of plaintiff, and on the 21st day of September, 1921, judgment was entered for plaintiff in the sum of $8503.74, and defendant has duly appealed therefrom.

The defendant assails the judgment as one contrary to the law under the facts agreed upon by the parties. It is insisted that the renewal of an accident policy is a new contract of insurance for the period specified therein; that the delivery of the renewal receipt was a mere offer by the defendant to renew or continue the insurance in force which could result in a contract only through the insured's acceptance of the offer; that such acceptance must be a communicated acceptance and that a merely mental determination to accept will not suffice. Defendant's other alternative contention is, that the injury received by the insured in his assault upon another, was not an injury through accidental means.

I.   The contract in force up to noon on the 7th day of March, 1920, under the prior renewal, expired on that day, by its own terms. The continuance of the insurance **Renewal Contract.** beyond that date required the making of a contract, or such acts or arrangement by the parties as would extend the terms of the policy for another period. It has been held generally that the renewal of an indemnity bond, or of a policy of this character, "constitutes a separate and distinct contract for the period of time covered by such renewal." It is, however, a contract with the same terms and conditions as those contained in the policy which is renewed. [Long Brothers Groc. Co. v. U. S. Fidelity & Guaranty Co., 130 Mo. App. l. c. 430; Commercial Bank v. American Bonding Co., 194 Mo. App. 224, 229, and cases there cited.]

Insurance is a matter of contract and is governed by the rules applicable to contracts. In the application of these rules it has been held in numerous cases upon

<span style="font-variant: small-caps">Offer or Proposal.</span> accident insurance policies that the delivery of a renewal receipt by the insurer to the insured without a request by the insured, is an offer or proposal, which must be accepted by the insured before there can be a contract of insurance effected. [Richmond v. Travelers' Ins. Co., 123 Tenn. 307; Pacific Mutual Life Ins. Co. v. Vogel, 232 Fed. (C. C. A.) 340; Brawner v. Royal Indemnity Co., 246 Fed. 637; Grogan v. Travelers' Ins. Co., 139 Pac. (Colo.) 1045.] Other cases under somewhat similar circumstances, with like holdings, are: Harper v. Ins. Co., 64 S. E. (Ga.) 567; Pennsylvania Fire Ins. Co. v. Sorrels, 98 S. E. (Ga.) 358. Clearly, the renewal of such a policy cannot be imposed upon the insured against his will. His assent is necessary to the proposal, to make it binding, but his assent need not be manifested in express or formal terms. The courts in the cases last above cited, relied upon by appellant, applied the rule stated to facts, varying in each case, but yet presenting in each case an issue substantially similar, that is, the issue as to whether there was an acceptance of the offer, so as to constitute a contract and bind the insuring company. The salient features of some of these cases are mentioned.

In Richmond v. Travelers Ins. Co., a case cited in most of the others mentioned, the agents of the insurance company mailed to the insured a renewal receipt providing for the extension of his accident policy for six months, stating that check for the amount of the premium could be sent at his convenience. Sixteen days later the insured wrote, saying he had decided to discontinue the insurance, and returned the receipt. On the following day the agents wrote insured urging him to keep his insurance in force, and offering time for payment of the premium. Insured was killed before this offer was received. It was held that his delay for sixteen days before replying to the offer of renewal could not be construed as being an acceptance. There was in that case no evidence as to any prior course of dealing between the parties.

In Pacific Mutual Ins. Co. v. Vogel, the renewal re-

ceipt was mailed to insured under a custom or course of dealing which had theretofore obtained, under which the definite time of sixty days was given in which to make payment of the premium. When called upon, about sixty days after having received the renewal receipt, the insured answered that he would make payment in the following week. To this the company made no reply, but left the receipt in Vogel's hands, and took no action toward cancellation. About the time the promised payment was to be made, but before making it, the insured met with an accident. After notice of this was received by the company, insured's son made payment of the premium, which was retained by the company, and a few days later the insured died of the injuries he had received. The trial court submitted to the jury the issue whether there was a consummated contract at the time of the injury, and there was a verdict for plaintiff. This was affirmed 'on appeal. The situation is thus tersely stated by the court, 232 Fed. l. c. 342:

"There was evidence of an unequivocal offer to continue in force a policy of insurance about to expire, a custom to extend credit for the payment of the premium for a given period, a practice to make further extensions to procure business, knowledge thereof and conduct thereunder by the insured in previous years, actual extension of credit in this instance beyond the customary period, a call for payment after the period of extension had been enlarged, a promise by the insured, perhaps in the nature of a counter-offer, to pay a few days later, no verbal response or act by the company either rejecting the counter-offer or withdrawing its original offer, an accident to the insured inferably within the period of the counter-proposition with the renewal premium receipt in his hands uncancelled, immediate and formal notice of the accident to the company, no response or inquiry on its part, subsequent payment of the premium and its acceptance and retention."

The court further on said: "This testimony fairly raises the issue whether the payment of premium after the accident was in pursuance of a credit extended by a

contract consummated before the accident, or was payment of a past-due premium upon a policy which had previously expired, by which the policy was reinstated only as to injuries thereafter sustained.'' It was held that there was evidence by which a verdict either for the plaintiff or for the defendant might be sustained; that is, the jury might reasonably find for plaintiff on the theory that the payment was upon a previously consummated contract, or for defendant on the theory that the payment reinstated the policy only as to injuries received after payment was made.

In Grogan v. Travelers Ins. Co., the agent mailed a renewal receipt to the insured, whose business kept him away from home most of the time. Not having heard from him, the agent at the end of sixty days advanced the premium, in an endeavor to continue the business and keep the insurance in force, and wrote to the insured so advising him, and asking that he repay the amount of the premium advanced. He replied, regretting the premium had been advanced and saying he had ''about decided to discontinue the policy.'' The agent again wrote urging that he keep the insurance, but, if not, that he pay the proportionate amount for the time already elapsed and return the receipt. He replied, promising to return the receipt upon his return to his home, but not agreeing to pay anything. Pending this state of affairs, he was accidently killed. It was held there was no acceptance of the offer of renewal, and no contract of insurance in force.

Counsel for appellant also cite upon the point here under consideration the case of State ex rel. Equitable Life Ins. Co. v. Robertson, 191 S. W. 989. In that case there was an application for a certain form of life policy, at a stated premium. The company rejected the applications made, but issued a policy somewhat different, and calling for a different rate of premium, but this policy, as clearly appears, was never presented to the insured for acceptance. No other transaction or prior course of dealing between the parties had existed. It was held that there was no consummated contract.

In the case at bar the mere fact that the insured had not paid the premium is not emphasized, and is not important, because credit was extended for that, if the insured elected to continue the insurance. While it is thus insisted that mailing the renewal receipt to the insured was only an offer, which required an acceptance by him, and its acceptance is not admitted by appellant, the serious contention made is not as to what the insured in fact intended. The matters set out in the agreed statement, the long course of conduct of insurer and insured, the lapse of time with no rejection, and the careful preservation by insured of the renewal receipt, warrant the conclusion drawn by the trial court that the insured had accepted the offer. The holdings in the cases cited and above referred to, and others on the like issue, are not authority for holding under the circumstances of this case that as a matter of law there was no acceptance, but an acceptance is readily inferable from the facts admitted.

*Acceptance.*

But the essential and serious contention of appellant goes further. The claim is that an uncommunicated acceptance is of no avail, and that since no communication of insured's intention was made to the insurer there was no contract and no obligation upon the insurer. This would necessarily carry with it the correlative statement that there had arisen no obligation on the part of the insured, since both would be bound by contract or by mutuality or estoppel, or neither would be. It is necessary, therefore, to consider the conduct of the parties in its relation to the fact that no actual communication took place between them after the mailing of the renewal receipt.

*Communicated Acceptance.*

In the comparatively early case of Lungstrass v. German Ins. Co., 48 Mo. 201, it was said at page 204:

"It is true that no contract can arise from a proposition or offer on one side until it is accepted on the other; until then it remains merely a proposition. And it is also true that this acceptance must be evidenced by some act that binds the party accepting. A man's mental reso-

lution, that can be changed, is not sufficient; both parties must be bound or neither will be. The usual mode of accepting a proposition made by correspondence is by notice of acceptance, and though it was formerly held that it did not ripen into a contract until receipt of the notice, yet the doctrine now is that the contract is complete when the acceptance is forwarded, without reference to the time of its reception. [Kentucky Ins. Co. v. Jenks, 5 Ind. 96; Halleck v. Com. Ins. Co., 21 Dutcher, 280; Taylor v. Ins. Co., 9 How. 390.] But notice is not the only evidence of acceptance. Any appropriate act which accepts the terms as they were intended to be accepted, so as to bind the acceptor, just as clearly evidences the concurrence of the parties—the bringing their minds together—as a formal letter of acceptance. The terms, 'the nature of the offer, or circumstances under which it is made,' or relation of the parties, may indicate another mode; and if so, its adoption equally binds them.''

In that case the policy was upon property owned by Lungstrass, who was an agent for the defendant company at Sedalia. The policy, written at the company's office and mailed to him, was in lieu of and at a lower rate than a prior policy. As agent he was allowed a commission upon the premium, and in his character as agent he was required to include this premium in his regular monthly account current with the company, charging himself with the premium, and taking credit for the commission. On the day he received the policy he made the appropriate entry upon the book kept by him as agent, but he did not communicate his acceptance to the company, nor pay the premium. His monthly account current was not due. The property was destroyed on the day after he received the policy. The effect of the decision in that case was that express notice of acceptance may be dispensed with, where apparently not contemplated, and some other act of acceptance is equally clear.

In the case at bar there was a long established course of dealing between the insured, and the agents of the insuring company, having all the authority of the com-

pany itself in respect of the execution and delivery of policies extending time of payment, and granting credit. The renewal receipt in issue here was mailed pursuant to this course of dealing. . It was unconditional in its terms. The letter which accompanied it did not impose or imply any conditions as to payment, or acceptance. In all respects it followed their former regular course of dealing. Acceptance of prior renewals had been express, only when the insured made the actual payments and in these he had been "customarily slow." Formerly, before payment, through retention of the receipt by the insured, an acceptance was implied, and as such was recognized by both parties. Upon that assumption or condition they acted in their established course of dealing with each other.

Under this course which prevailed for a considerable period between the insured and these fully authorized agents, the conclusion cannot well be avoided that each successive renewal was intended to go into effect immediately upon delivery of the renewal receipt, and to continue in effect during the period of six months. This must have been the intention of both parties, notwithstanding the fact that according to their custom and course of dealing, the insured did not expressly signify his acceptance otherwise or until by payment of the premium, and that was not done at any stated time, nor all of a premium always paid at one time. If that were not so, and if notice of acceptance was necessary each time, though not concurrent and immediate payment, to consummate the contract, then there was, under their course of dealing a considerable interval in each period, during which no contract was in force, although the insured was paying for the full period. The company would have received the full benefit of the contract, but the insured would not. This was not a result which it is, presumed was contemplated by either party. This view is strengthened by the character of the correspondence between the company and attorneys for plaintiff when and after the proofs were forwarded. The company re-

turned the proofs submitted as not being a compliance with the terms of the policy, and when asked for an explanation of the rejection, pointed out the manner in which the insured met his death as showing that it did not occur through accidental means, nor in a manner provided for by the policy, and no claim that the policy was not in force was made until the filing of the answer in this proceeding.

In this case there is no evidence as to when the agents were required to account for premiums upon renewals made by them. There is nothing as to a fixed time of sixty days, as in some of the cases mentioned, at the end of which the insured must make payment, or expressly signify his acceptance. The retention of the renewal receipt, which embodied a contract long kept in force and whose terms were well known to the insured, and the placing of it in his safe among his other valuable papers, are acts from which it may well be inferred that he had accepted it. From the course of dealing, and from the circumstances under which the receipt was mailed by the insurer, the inference may well be drawn that the insurer did not contemplate requiring or receiving a formal notice of acceptance. The time that had elapsed, from March 7th to May 31st, was a period not unusual, during which these parties had been wont to treat the renewal as in force. The course of conduct pursued for so long a time by the parties, was within the knowledge and the minds of both, and this knowledge was applicable as a form of notice, in the transaction here under consideration, which in every particular was as one of a train of like events, beginning some years before, and running up to the time when the insured was killed. The facts and circumstances tend to show an actual acceptance by the insured, of an offer made upon known terms and in the accustomed way, under circumstances not contemplating any communication from him except and until the making of payment as usual. On the part of the insured and under the circumstances here disclosed, the retention of the renewal receipt implied an ac-

ceptance, and on the part of the company, its non-return, without more, implied notice of the acceptance. Both may be presumed to have acted in this transaction with notice of, and in reliance upon mutual conformity with their accustomed manner of dealing. By their acts, thus done and suffered, pursuant to a long recognized rule, established by themselves, neither at the time was entitled to disclaim his respective obligation, to the loss of the other. Upon the primary question, whether the renewal contract was in force, the finding of the trial court was a fair and reasonable conclusion to be drawn from the evidence.

II. The substantial part of the evidence showing the manner in which the insured, Henry A. Eicks, was killed has been set forth. The appellant contends that: "An injury received by the insured in an assault upon another is not an injury effected through accidental means." Primarily, in support of this, the following authorities are cited: Hutton v. State Acc. Ins. Co., 108 N. E. (Ill.) 296; Gaines v. Fidelity & Casualty Co., 111 App. Div. (N. Y.) 386; Taliaferro v. Travelers' Ins. Co., 80 Fed. 368; Carnes v. Traveling Men's Assn., 106 Iowa, 281; Rock v. Travelers Ins. Co., 172 Cal. 462. Most of these, and other like cases, were cited, and were considered by this court in Berryman v. Southern Surety Co., 285 Mo. 379. Supplemental to the cases mentioned, many decisions by courts of other jurisdictions are cited in cases not involving assaults, but arising out of injuries received in many and varied forms of voluntary exertion by the insured persons, wherein was drawn a distinction between "accident," and "accidental means." Upon this line of distinction it is insisted "that an injury which is the unforeseen or unexpected result of an intended act is not an injury sustained or effected through 'accidental means,' but that the cause, i. e. the means, which occasioned such injury must be accidental and unintend-

*Accidental Means: Unexpected Assault.*

ed." The distinction is one that has not been drawn by the appellate courts of this State.

In Summers v. Fidelity Mutual Aid Assn., 84 Mo. App. 605, the policy sued on insured the deceased against bodily injuries effected by "purely accidental means." He was a "hostler helper" in a railway shop, and in attempting to lift a heavy truck he sustained a hernia which resulted in his death. The Kansas City Court of Appeals construed the policy as an insurance against the result of accident, and held that the hernia was produced by accident. The opinion uses the word "accidental" and the words "accidental means," as interchangeable and equivalent terms.

In Young v. Railway Mail Assn., 126 Mo. App. 326, the St. Louis Court of Appeals had before it a policy insuring against injuries sustained by "accidental means." In that case the insured, a railway mail clerk, in lifting a heavy sack of mail, ruptured a blood vessel in his right lung. With him the lifting of a mail sack was a voluntary, usual and ordinary thing. Substantially the same contention was made in that case as is made here, that is, that the injury which was the unforeseen or unexpected result of a voluntary or intended act was not an injury sustained through "accidental means." The court reviewed extensively the authorities for and against the position taken by the appellant in that case, and rejected as too strict and illiberal the construction given by some courts and contended for the appellant. The court stated its definition of "accidental means." as derived from the best considered American cases, "which hold that accidental means are those which produce effects which are not the natural and probable consequences of the act.'" This is widely different from saying that the means or the cause by which the effect is produced must be accidental. In that case, as in the Summers Case, the injury was "the unforeseen or unexpected result of an intended act."

In Collins v. Fidelity & Guaranty Co., 63 Mo. App. 253, the Kansas City Court of Appeals had under con-

sideration a policy insuring against bodily injuries sustained through "accidental means." The insured, in that case, was killed by a shot from a pistol fired intentionally at him by another man. One of the defenses set up was that the injury was not sustained through "accidental means." There was evidence tending to show that deceased brought on the difficulty which he must have known might likely result in his death, and there was evidence to show that he did not bring on the trouble and that what occurred as a result was not within his expectation. The court referred to the holding in a prior decision, Phelan v. Traveler's Ins. Co., 38 Mo. App. 640, where the insurance was against injuries sustained through "accidental means," and the death of the insured resulted from being intentionally shot by another. The court, referring to the Phelan Case said: "We held in that case that the term, 'accidental means,' applies to the conduct of the assured, as distinguished from the party doing the injury." And the court continued: "An injury not anticipated and not naturally to be expected as a probable result, by the insured, though intentionally inflicted by another, is an accidental injury within the terms of the policy. [Citing cases.] A death may be the result of an intentional and not accidental act of the party doing the injury and yet be an accident, as that word should be construed in the policy, in its application to the deceased." In that manner disposing of the issue made, and disposing also of the question of a distinction between the terms "accident" and "accidental means," the court sustained a judgment in favor of the plaintiff.

In the recent case of Berryman v. Southern Surety Co., 285 Mo. 379, this court had before it a policy insuring against bodily injury sustained through "accidental means," and where the insured was killed by a shot from a pistol intentionally fired at him by another person. The court did not undertake to discuss the difference in meaning between the expressions, injury sustained by "accident" and injury sustained through "accidental means," but referred approvingly to what had been de-

clared in Collins v. Fidelity & Guaranty Co., supra, and in Lovelace v. Traveler's Assn., 126 Mo. 104. In the latter case the insurance was against "accident," and the insured voluntarily entered into an altercation with another, not known to be armed, but who shot and killed the insured. In the Berryman Case the court reached the conclusion that the evidence justified a finding that the killing of the deceased was unlawful, and without reason for him believing that the other party was armed and intended to do him bodily harm. But, shortly before, on the same day a quarrel had taken place between Berryman and Richardson, in which the former had beaten the latter. In all of these cases the unforeseen and unexpected character of the result had been the determinative element.

In the Berryman Case the act of Richardson was held to be an intended act, but as to Berryman it was held to be an unforeseen and unexpected act, or an act done through "accidental means" within the meaning of the policy. In the case at bar, Osterman struck the insured intentionally, but it is expressly admitted that he had no intention of killing him. It is not admitted that the act was unforeseen and unexpected by Eicks, but it is a natural conclusion to reach from the facts admitted, that the effect was unforeseen and unexpected on his part. Both were unarmed. Their properties were close together, and abutting upon the same alley. Osterman was engaged in cleaning up and burning rubbish. Eicks, coming out, accused Osterman of taking his garbage box, which was denied by Osterman; and continued charges and denials resulted in Eicks threatening to break Osterman's head. Eicks, thus threatening, advanced upon Osterman, a man inferior in size and strength, who suddenly picked up the mop or broom which was lying in the alley, and quickly struck the blow. The thing done, and the effect of it, were alike sudden, unforeseen and unexpected. Tested by comparison with the facts in the Berryman and Lovelace cases, and the other cases referred to, and the holdings in those cases,

there is nothing to distinguish this case in any material way from those cases.

The judgment should be affirmed. *Small, C.,* concurs.

PER CURIAM:—The foregoing opinion of LINDSAY, C., is hereby adopted as the opinion of the court. All of the judges concur.