No. 30,505.

THE KANSAS CITY TITLE AND TRUST COMPANY, *Appellee,* v. THE
FOURTH NATIONAL BANK IN WICHITA, *Appellant.*

(10 P. 2d 896.)

Opinion filed May 7, 1932.

*Charles G. Yankey, John L. Gleason, Kenneth K. Cox, Harvey C. Osborne, John G. Sears, Jr.,* and *Morris H. Cundiff,* all of Wichita, for the appellant; *Henry L. McCune, Robert B. Caldwell* and *Blatchford Downing,* all of Kansas City, Mo., of counsel.

*W. A. Ayres, Austin M. Cowan, C. A. McCorkle, J. D. Fair, W. A. Kahrs,* all of Wichita, *Arthur N. Adams* and *Arthur N. Adams, Jr.,* both of Kansas City, Mo., for the appellee.

The opinion of the court was delivered by

DAWSON, J.: This was an action to recover a large sum of money which the defendant bank had paid on checks bearing forged indorsements and which it had charged against the checking account of the drawer.

It appears that for a number of years the Monarch Loan Company of Wichita was engaged in loaning money on farming lands in southern Oklahoma and northern Texas. It kept its checking account in the Fourth National Bank in Wichita. Mortgage loans were negotiated for this loan company by one J. R. London, a real-estate dealer at Marietta, Okla. London's usual method was to have the applicant for a loan fill out a written statement of such facts as an investor would want to know about himself, his assets and liabilities. Such application was forwarded to the loan company, and if this preliminary statement was favorably received, the loan company would send its examiner to look over the property and make whatever further investigation was desired. Then a note and mortgage executed by the borrower were forwarded to the loan company together with an abstract of title to the mortgaged property and the opinion of a firm of lawyers approving the title. The loan company would then take out a policy of insurance guaranteeing the title. This insurance was furnished by the Kansas City Title and Trust Company. Certain deductions were made from the amount of the loan—for commission, abstract, recording, and insurance title fees; but these details require no present attention. The loan company

would then draw its check on the Fourth National Bank in Wichita in favor of the borrower for the net amount of the loan and mail it to London for delivery to the payee. In eight or nine years just prior to 1929 London negotiated about a hundred such loans, seven of which were fraudulent. In some of these seven instances the applications, notes and mortgages were signed by London in the names of fictitious persons; in others the names of existing persons were forged by him. The abstracts of title were tampered with, and the name and seal of a fictitious notary used in at least one instance. When the loan company's checks payable to the supposed borrowers were received by London his usual method of dealing with them was to indorse the name of the payee and follow this with his own name, thus:

"David Cooper.

"O. K. J. R. London."

In two instances he indorsed the name of the payee without following it with his own signature. The checks carrying these forged indorsements and bearing the usual chain of indorsements of banks through which they passed were paid by the Fourth National Bank in Wichita, and the loan company's checking account was charged therewith. According to the practice of the bank, monthly statements of the condition of its checking account were rendered to the loan company and all checks which the bank had paid and charged against its checking account during the month were returned therewith to the loan company. The seven checks with forged indorsements charged by the bank against the loan company and relevant data may be conveniently set down thus:

| | Date of check. | Amount. | Payee. | Paid by bank. | Checks returned with monthly statement. |
|---|---|---|---|---|---|
| 1. | 9-22-1923 | $3,559.20 | William York | 9-27-1923 | Oct. 1, 1923 |
| 2. | 11-23-1925 | $800.00 | Richardson Watson | 11-27-1925 | Dec. 1, 1925 |
| 3. | 6-30-1926 | $1,986.00 | F. B. Brockett | 7- 7-1926 | Aug. 1, 1926 |
| 4. | 10-21-1926 | $8,000.00 | A. J. Allen | 10-27-1926 | Nov. 1, 1926 |
| 5. | 4-13-1927 | $943.75 | Lillian McCoy | 4-21-1927 | May 1, 1927 |
| 6. | 7-26-1927 | $2,230.00 | David Cooper | 8-1-1927 | Sept. 1, 1927 |
| 7. | 9-19-1927 | $1,414.90 | J. M. Thomas | 9-15-1927 | Oct. 1, 1927 |

To forestall early discovery of his forgeries London paid the interest on the bogus loans himself, but eventually a notice from the loan company to David Cooper concerning the interest on his supposed loan brought a prompt response that he owed nothing. This caused the loan company to make an investigation which developed the facts outlined above. Then the loan company notified the bank that it had erroneously charged its accounts with the amounts of the checks bearing these forged indorsements.

The loan company had sold and assigned the bogus notes and

mortgages to various third parties, but it made arrangements with the Commerce Trust Company of Kansas City, Mo., to act as stake holder for the assignees to take up those notes and mortgages, and the Kansas City Title and Trust Company furnished the funds for their redemption. The loan company and the title company also made a contract whereby they settled all claims arising between them growing out of the title company's guaranty of the titles to the lands covered by the bogus mortgages; and the loan company assigned to the title company its claims against the Fourth National Bank.

This action was then commenced, on October 26, 1929, by the title company against the Fourth National Bank. The foregoing facts and other relevant details were pleaded in seven causes of action to recover the amount of the charges made against the loan company's account on the seven checks having forged indorsements.

The defendant bank first demurred and then answered at length, raising various questions of law—that plaintiff could not through subrogation become invested with any cause of action the loan company may have had against the bank; that plaintiff was a gratuitous assignee and the assignment it had received from the loan company gave it no additional rights against the bank; that the withholding of the mortgage notes and title insurance policies by the loan company from the bank was a ratification of the bank's payment of the checks; that plaintiff had no rights upon the William York check under any assignment, and that the statute of limitations barred a recovery on the York, Watson and Brockett checks which the bank had paid and accounted for to the loan company more than three years before this action was begun. Further issues raised by the answer may not require attention.

The cause was tried before a jury, but no sharp issues of fact were developed. A verdict and special findings favorable to the plaintiff were returned and judgment on all counts was entered in its behalf.

The bank appeals, urging various points of law which will be considered in the order of their presentation.

1. Defendant first contends that the title company did not become subrogated to the loan company's cause of action against the bank, and that subrogation is a rule of equity which is not applied against a party which has superior equities to those of the subrogee. Touching the last phase of this contention first, the liability of the bank arises from its payment of the checks on forged indorsements. The liability of the title insurance company was to insure the le-

gality of the titles to the mortgaged lands as shown, by the abstracts. These liabilities were distinct and unrelated to each other. The title company owed no duty to the bank. In such a situation we can discern no basis for holding that the equities of the bank were superior to those of the title company.

Moreover, if the title company's liability under its policies guaranteeing the titles to the fraudulently mortgaged lands was absolute, it was entitled to maintain this action under what some of the courts have designated as conventional subrogation. This right does not depend upon a mere rule of law for its basis as in legal subrogation, but upon the terms of a lawful contract. In 8 Couch on Insurance, 6589, it is said:

"It also is of interest that for the purpose of defining the word 'subrogation' two kinds are recognized, namely, 'legal' and 'conventional.' These terms have been defined as follows: 'Legal subrogation is allowed only in cases where the person advancing money to pay the debt of the third person stands in the situation of a surety, or is compelled to pay the debt to protect his own rights. Conventional subrogation results from an agreement, made either with the debtor or the creditor, that the person shall be substituted.' In other words, 'legal subrogation' arises by operation of law as the result of equities, whereas 'conventional subrogation' depends upon a lawful contract calling for subrogation."

In Sheldon on Subrogation, 2d ed., 7, it is said:

"Subrogation to the rights of a creditor differs from an assignment of the debt, in that the latter assumes the continued existence of the debt, while the former follows only upon its payment. Before the right of subrogation accrues, the legal obligation resting upon the ultimate debtor must be discharged. But the subrogation of an insurer to the remedies of the insured for the destruction of the insured property proceeds rather upon an implied assignment than upon a satisfaction of the cause of action. And the party for whose benefit the doctrine of subrogation is exercised can acquire no greater rights than those of the party for whom he is substituted; if the latter had not a right of recovery, the former can acquire none."

See, also, *Home Savings Bank v. Bierstadt*, 168 Ill. 618, 61 Am. St. Rep. 146; 25 R. C. L. 1312.

The title company's conventional right of subrogation in this case was one of the considerations for which it undertook to insure the titles to the mortgaged properties. The pertinent paragraph of the insurance policy read:

"2. Whenever the company shall have settled a claim under this policy, it shall be entitled to all rights and remedies which the party guaranteed, and the owner of said indebtedness would have had against any other person or property in respect to such claim, had this policy not been made, and the party

guaranteed undertakes to transfer or cause to be transferred to it such rights, together with the right to use the name of the party guaranteed and the name of the owner of said indebtedness, when necessary for the recovery thereof such rights of subrogation to vest in the company unaffected by any act of the party guaranteed or the owner of said indebtedness, but such subrogation and transfer shall be in subordination to the claim of such owner to receive and be fully paid the amount of principal and interest and other moneys, if any there be, secured by said trust deed or mortgage."

The plaintiff in this case also asserted its causes of action herein by virtue of an assignment from the loan company of its claims against the bank, and its rights under that assignment were not inconsistent with its claim by conventional subrogation.

2. It is next suggested by defendant that plaintiff was a gratuitous assignee and therefore not entitled to maintain this action against the bank. There is, indeed, a rule of law that a mere intermeddler cannot claim rights of subrogation by paying the obligations of a third party (25 R. C. L. 1324-1326), but that rule does not apply to a case of conventional subrogation nor to one where the party seeking to maintain the cause of action holds a legitimate claim by lawful assignment. No rule of law or public policy forbade the loan company and the title company to compose and settle the question of the title company's liability under the policies insuring the titles to the mortgaged lands. And no rule of law or public policy forbade the assignment to the title company of the loan company's claim against the bank. (*McCrum v. Corby*, 11 Kan. 464, syl. ¶ 2.) And what difference can it possibly make to the bank whether it pays the loan company on its unavoidable liability or pays the title company as assignee of the loan company, so long as in paying it satisfies a liability it cannot escape?

3. It is next contended that since the loan company withheld from the defendant bank the mortgage notes and insurance policies it thereby ratified the bank's payment of the checks, and consequently it had no cause of action which could pass to the title company by subrogation or assignment. This argument is predicated on the assumption that the notes and mortgages had some material value, the withholding of which wrought some loss or disadvantage to the bank. But the notes were forgeries; so, too, were the mortgages. They were utterly without value. Their delivery to the bank would have clothed the bank with nothing of value. A pertinent provision of the negotiable instruments act (R. S. 52-223) recognizes this point. One consideration for the issuance of the

policies (in addition to the premium) was the provision in each of them that if the insured had a loss and the title company had to pay, the title company was to have all the rights of the insured against whatever party caused the loss. The insurance contract further provided that it was not to be assigned without the title company's written consent.

4. Appellant makes a special point against a recovery on the cause of action predicated on the check payable to William York, contending that plaintiff took nothing thereunder by assignment from the loan company, and that the holder of that loan to whom it has been sold by the loan company had no claim against the bank. For a reason which will later appear we deem it unnecessary to rule on this point.

5. Complaint is made that the trial court placed upon the bank the burden of proof that the checks were paid according to directions of the loan company. Appellant concedes that under the general rule of law the burden is upon a bank which pays a depositor's funds upon check bearing forged indorsements to prove facts sufficient to avoid liability to the depositor (*United Workmen v. Bank*, 92 Kan. 876, 142 Pac. 974, 54 L. R. A., n. s., 815), but it contends that the circumstances of the present case justify the application of a different rule. Before another rule could be applied it would have to be invented, for counsel for defendant do not refer us to any law book which states it, and we know of none.

6. Before taking up one phase of this appeal which will require special treatment we will take notice of some matters urged by appellant in its reply brief. It is urged that no negligence on the part of defendant was shown. Perhaps not the sort of negligence which requires judicial concern in actions of tort; but the causes of action constituting this lawsuit were not founded on defendant's negligence. They were based upon the bank's absolute liability for the payment of the loan company's checks on forged indorsements. In *United Workmen v. Bank*, supra, this court said:

"The rule appears to be that payments upon forged indorsements are at the peril of the bank making them, unless it can claim protection upon some principle of estoppel or negligence chargeable to the depositor." (p. 883.)

The same rule of law was applied in the later case of *United Workmen v. Bank*, 101 Kan. 369, 166 Pac. 490. (See, also, *McCormack v. Central State Bank*, 203 Ia. 833, 52 A. L. R. 1297, and annotation.)

Defendant's next contention is that the payment of the checks on forged indorsements was not the proximate cause of plaintiff's loss. This contention is not easy to understand. Presumably what is meant is that the payment of the checks was not the proximate cause of the loan company's loss. Well, what caused the loss? The loan company's checking account was depleted to the extent of nearly $19,000. What depleted it? The charging against it of the checks bearing forged indorsements, and that was done by the bank. The fact that the checks bearing the forged indorsements also carried later genuine indorsements of other banks through whose hands the checks passed before being presented for payment afforded defendant no escape from liability. In *Harmon v. Old Detroit Nat. Bank*, 153 Mich. 73, 17 L. R. A., n. s., 514, which is cited approvingly in *United Workmen v. Bank*, 92 Kan. 876, 885, 142 Pac. 974, it was held:

"Where a bank pays a forged check, or one upon which the name of a fictitious payee had been fraudulently substituted, the fact that the check came to the paying bank through other banks does not relieve it of the duty of investigation to determine the identity of the original presenter with the payee named in the check, and if the paying bank chooses to rely upon the identification accepted by the bank which cashed the check, it does so at its own risk." (Syl. ¶ 3.)

In the opinion in this case it was said:

"If the drawee chooses to rely upon the identification by the bank which cashed the check, it does so at its own risk, and its recourse is upon that or some intermediate bank." (p. 78.)

Another point urged by appellant is that although the loan company might have had a cause of action against the bank, the plaintiff as assignee of the bank's cause or causes of action was subject to superior countervailing equities of the bank. But this court is unable to discover any countervailing equities in favor of the bank. If the loan company had gotten anything of value by reason of the payment of the checks bearing the forged indorsements, and the bank had made good the depletion of the loan company's checking account, the bank would or might be equitably entitled to whatever the loan company acquired, and if withheld there might be a situation where defendant's argument about the loan company's ratification of the charges against its checking account would be applicable. In the circumstances of this case there was nothing which could be construed as such ratification.

We pass now to the legal question whether the statute of limita-

tions bars the causes of action based upon the charging of the oldest checks—those of York, Watson and Brockett—against the checking account of the loan company. Those checks were so charged more than three years before this action was begun. In the regular course of business, at the end of the month in which those checks were so charged, a formal monthly statement of account was rendered to the loan company by the bank and the checks thus charged were delivered to the loan company along with the checks. Cases are cited by appellee, and textbook doctrine also, to the effect that while the statute of limitations runs against a cause of action arising from the payment of a forged check as soon as such check is returned to the drawer because it is his duty to examine his checks promptly to see that they bear his genuine signature, but that the rule is otherwise as to forged indorsements, and he is not bound to scrutinize his returned checks for forged indorsements. (Magee on Banks and Banking, 3d ed., 362a.) Be that as it may, defendant's main contention in this connection is that the bank's monthly statement to the loan company showing what checks were charged against its checking account during the month, which was regularly rendered to the loan company together with the canceled checks at the close of each month, was in legal effect an account stated, and while subject to correction within a reasonable time, each of such monthly statements was a notice to the loan company of the bank's disavowal of any liability on the checking account for any greater sum than that admitted by such account stated. There is in our opinion much force in this contention. The relation of a bank to its depositor is that of debtor and creditor, and the sum he has on deposit in his checking account is a debt of the bank payable to him on demand; yet because it is payable on demand he cannot sue the bank for the amount of his deposit until payment on demand has been made and refused; and such demand and refusal are necessary to set in motion the statute of limitations. But where the bank renders a statement to the depositor showing the status of his checking account, it says to him in effect, "This bank owes you this stated balance, and no more." Such statement may fairly be construed as a notice that any claim the depositor may make in excess of the stated balance would be resisted by the bank. And in that view of the situation the depositor's formal demand for a greater sum and the bank's formal refusal to pay a larger sum would be unnecessary to perfect the depositor's cause of action, and likewise to set in motion the

·statute of limitations. If this is not the legal effect of the bank's
monthly statement to its depositor, it is not apparent what function
the monthly statement performs. Where a bank pays out a deposi-
tor's money ·on a· forged check there is a special limitation in the
bank .act (R. S. 9-171) which bars an action against the bank un-
·less it is notified of the forgery within six months. No express
limitation is made by statute governing the time in which an action
can be brought against a bank for the payment of a depositor's
funds on a check bearing a forged indorsement. In that situation
it would seem that some provision of section 17 of the civil code
(R. S. 60-306) must apply. Surely the menace of liability for in-
definite amounts of money paid on checks bearing forged indorse-
ments should not hang over a bank forever. The liabilities sought
to be enforced against this bank aggregate $20,000. They accumu-
lated over a period of·seven years. If this series of forged indorse-
ments had fallen on almost any one of the numerous smaller banks
of the state, it would have wrecked it completely, and that, too,
without any actual wrongdoing on the bank's part, however culpable
in law it may be.

In *Munnerlyn v. Augusta Bank*, 88 Ga. 333, 30 Am. St. Rep. 159,
while affirming the general rule that the statute of limitations does
not begin to run in favor of a bank until a demand and refusal has
been made, the court said:

"[But] we do not mean to hold that such demand could be indefinitely
delayed; for under the rule laid down in the books, this might be done for
such a length of time that the right to the money would become stale."
(p. 337.)

In *Benefit Association v. Bank,* 99 Miss. 610, the action was by a
depositor against a bank which had paid plaintiff's check drawn in
favor of the beneficiary of an insurance certificate. .The name of
the payee indorsed on the check was a forgery.; the check was paid
by the bank on which it was drawn, and the amount charged to
the drawer's checking account. Eventually the check was returned
to the drawer together with its bank pass book showing the net
balance standing to the depositor's credit in the bank. Neither the
bank nor the depositor learned that the check had been paid on a
forged indorsement until nearly four years later. The supreme
court of Mississippi held that the rendition of the statement of ac-
count showing the balance claimed by the bank to be due the de-
positor was equivalent to notice that any claim for a sum in excess

of that amount would not be paid, and as to such excess the statute would begin to run from the time of the rendition of such statement. In the opinion it was said:

"The contention that the statute did not begin to run until the discovery by appellant of the forged indorsement of the check is unsound. . . . There was no fraud perpetrated or concealed on the part of appellee. It paid the check in good faith, believing the indorsement genuine. Neither the appellant nor the appellee was at fault in failing to discover the forged indorsement after the payment of the check. Appellee's failure to discover the forgery at the time it was presented, resulting in its payment, made it liable to the party defrauded to the amount of the check; but after that the duty rested equally on appellant and appellee to discover the forgery, and appellant's opportunities for making the discovery were as good as appellee's, because appellant had in its possession the canceled check with the forged indorsement, which had been rendered to it as a voucher. The running of the statute was, therefore, not delayed to the time of the discovery by appellant of the forged indorsement. Our judgment is appellant's right of action accrued, and therefore the statute of limitations was set in motion against it, on January 1, 1903, on which date appellee rendered to appellant a statement of its account, showing this item of four hundred and twenty-five dollars charged against it." (pp. 631, 632.)

Counsel for plaintiff say that this Mississippi case is at variance with our own decision of *United Workmen v. Bank*, supra, but in that case the statute of limitations was not involved. The forged indorsement in the United Workmen case occurred on or about March, 1912; it was discovered in June; demand was made on the bank for repayment of $2,000 charged against plaintiff's account in July, 1912, and the action was instituted shortly thereafter (date not shown in our records), but judgment was entered in the trial court in June, 1913, and reversed with directions in July, 1914.

The effect of rendering monthly statements of the status of a depositor's checking account was not decided, but in the opinion by Mr. Justice Benson it was said:

"It was formerly held that a depositor owed a bank no duty to examine his pass book and vouchers to detect forgeries although the means of detection were thus afforded (*Weisser v. Denison*, 10 N. Y. 68), but recent decisions hold otherwise (*Morgan v. U. S. Mortgage & Trust Co.*, 208 N. Y. 218, 101 N. E. 371; Note, 7 L. R. A. n. s. 744.) . . . The object of requiring such an examination is to afford seasonable notice to the bank of any unauthorized payment in order that it may have an opportunity to retrieve against losses." (p. 884.)

The case cited by Judge Benson dealt with a raised check, while the United Workmen case grew out of a forged indorsement, but our

opinion did not suggest that the legal significance of the bank's monthly statement should be given any less significance in the one case than in the other.

See, also, note on effect of balances struck in bank pass book in 134 Am. St. Rep. 1019; 3 R. C. L. 532; 2 Paton's Digest, 1657 *et seq.;* id. 2148 *et seq.;* 30 Mich. L. Rev. 1108 to 1110.

Counsel for the parties have supplied us with exhaustive briefs which have been carefully perused, and we have examined the authorities cited on this question and such others as our time would permit. And while we recognize that there is much authority to the contrary, we think the rule announced by the supreme court of Mississippi cited above is eminently just. We hold that the rendition of a monthly statement to a depositor of the status of his account is fair notice to him of the amount the bank admits it owes him, and that it owes him no more. This practice of rendering monthly statements is born of the necessities of modern banking. They are made for the mutual protection of the bank and its depositor. Such a monthly statement may justly serve as a notice to set the statute of limitations in motion.

Having reached this conclusion, it will require no dissertation to show that the pertinent provision of the statute of limitations is the second clause of section 17 of the civil code (R. S. 60-306). The several causes of action are founded on an assignment of the loan company's choses in action upon the bank's implied contract with its depositor. (*Talcott v. National Bank,* 53 Kan. 480, 36 Pac. 1066; *Altman v. Bank,* 86 Kan. 930, 122 Pac. 874; *Washbon v. Bank,* 87 Kan. 698, 125 Pac. 17; *Missimore v. Hauser,* 130 Kan. 20, 285 Pac. 558.) It follows that plaintiff's third, sixth and seventh causes of action, founded on the deductions made from the loan company's checking account on the Watson, Brockett and York forgeries, were barred by the statute of limitations ere this action was begun and as to those counts the judgment must be reversed and judgment ordered thereon in favor of defendant. On the other four counts the judgment must be affirmed.

It is so ordered.