680 S.E.2d 778

**Roberta Cook GIBSON, as Trustee and Personal Representative of the Estate of Georgia F. Mitchell, deceased, Respondent,**

v.

**BANK OF AMERICA, N.A., Appellant.**

**No. 4536.**

Court of Appeals of South Carolina.

Heard Feb. 18, 2009.

Decided April 29, 2009.

400

Thomas William McGee, III, and Erik T. Norton, of Columbia, for Appellant.

J. Boone Aiken, III, of Florence, James B. Richardson, Jr., of Columbia, for Respondent.

GEATHERS, J.:

In this negligence and conversion action, Respondent Roberta Gibson obtained a judgment for actual and punitive damages against Appellant Bank of America (BOA) on Gibson's cause of action for negligence. BOA appeals the trial court's denial of its motions for a directed verdict and judg-

ment notwithstanding the verdict (JNOV) on the ground that Gibson's negligence claim is barred by the three-year statute of limitations, as set forth in S.C.Code Ann. § 15–3–530(5) (2005).[1] We reverse.

## FACTS/PROCEDURAL HISTORY

Gibson is the personal representative of the Estate of Georgia F. Mitchell. Mitchell died on November 19, 2000, at the age of ninety-two. Prior to her death, Mitchell maintained an interest-bearing checking account and a money market account at BOA's banking center on Parker Road in Florissant, Missouri. Both accounts were joint accounts co-owned by Mitchell and her best friend, Lucille Gilda. From November 16, 1999 through March 28, 2000, sixteen unexplained withdrawals from Mitchell's account occurred. During this time period, Mitchell relocated from Missouri to Cheraw, South Carolina on January 22, 2000 to live with Gibson, the widow of Mitchell's nephew. Within a few weeks after Mitchell's arrival in South Carolina, Gibson contacted her estate planning attorney to inquire about estate planning services for Mitchell, who was very affluent. As a result of his meeting with Mitchell, the attorney prepared a trust, will, and power of attorney for Mitchell. Gibson was named as the trustee of Mitchell's trust and Gibson's children were named as beneficiaries of Mitchell's will.

Mitchell received statements for her BOA accounts for the months ending February 7, 2000 and June 9, 2000.[2] The February 7 statement showed a balance of $43,961.37 for the money market account and a balance of $25,526.97 for the

1. In view of our disposition of this issue, we decline to address BOA's remaining issues. *See Futch v. McAllister Towing of Georgetown, Inc.,* 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (stating that the appellate court need not review remaining issues when its determination of a prior issue is dispositive of the appeal); *Barr v. City of Rock Hill,* 330 S.C. 640, 646 n. 3, 500 S.E.2d 157, 160 n. 3 (Ct.App.1998) (affirming grant of summary judgment on the expiration of the statute of limitations and declining to address appellants' remaining arguments on the trial court's alternate grounds for granting summary judgment).

2. The February 7 statement was mailed to Mitchell's Missouri address and the June 9 statement was mailed to Mitchell's South Carolina address.

checking account. The June 9 statement showed an approximate balance of $1,288.53 for the money market account and a balance of $20,537.99 for the checking account.[3] Thus, the combined depletion of the money market and checking accounts from February 7, 2000 to June 9, 2000 totaled $47,661.82. The statements for the intervening months, which showed the last six unexplained withdrawals, were held at the Parker Road banking center at the direction of the center's manager, Victoria Gan. According to Gan's deposition testimony, she had asked another BOA employee working in the statements department to send Mitchell's account statements to Gan's attention at the Parker Road banking center because Lucille Gilda had requested that the statements be held at the bank due to mail security concerns. Gan also testified that she mailed those statements to Mitchell at her South Carolina address in May 2000. After Mitchell had an opportunity to go through her mail, Gibson forwarded Mitchell's BOA statements to Gibson's daughter, Elizabeth Chanter, who was a certified public accountant. Chanter did not review those statements at that time.

Gan acted as the teller for virtually all of the sixteen unexplained withdrawals, and most of those withdrawals were in amounts of $5,000 or $10,000. According to Gan's testimony, after Mitchell relocated to South Carolina, she wrote a letter to Gan requesting that Gan mail to her four cashier's checks in the amount of $10,000 each. That letter has never been produced. Gan also testified that after she mailed the checks, Mitchell showed up at the Parker Road banking center on March 8, 10, and 15, respectively, to cash three of those checks and that Mitchell also appeared for all of the other unexplained withdrawals that Gan handled from November 1999 through March 2000. However, Gibson disputed Gan's testimony and presented evidence that Mitchell was in South Carolina on the dates in question. Notably, Gibson presented

---

3. The copy of the June 9, 2000 statement in the Record on Appeal does not show the page listing the exact balance for the money market account, but the "average balance" is shown on page one of the statement. Based on a comparison of the actual balance for February 7 to the average balance for that same date, the June 9 average balance is close enough to the June 9 actual balance for the Court to determine whether the depletion of the account should have alerted Mitchell to a problem.

evidence of Mitchell's execution of her will on the afternoon of March 15, 2000, in her attorney's office in South Carolina.

After Mitchell's death, several charities filed a petition in the Chesterfield County Probate Court to contest Mitchell's will. As a result of that litigation, in June 2002, BOA sent to Gibson several subpoenaed documents pertaining to Mitchell's accounts at the Parker Road banking center. Gibson gave the documents to Elizabeth Chanter to review. Upon reviewing the monthly statements for the first time, Chanter noticed the unexplained withdrawals, and, in July 2002, she prepared a chart summarizing the withdrawals. In October 2002, through counsel, Gibson finally contacted BOA to inquire about the withdrawals.

On September 26, 2003, Gibson filed the instant action against BOA, asserting causes of action for negligence, conversion, and intentional infliction of emotional distress. BOA later sought leave to file a third-party complaint against Victoria Gan on the theory that Gan may have participated in the unexplained withdrawals without BOA's knowledge or approval. Gan was suspected of embezzling funds from Mitchell's accounts through the unexplained withdrawals. The trial court denied the motion to file a third-party complaint but granted BOA's motion for summary judgment on Gibson's emotional distress claim. The trial court also ruled that Gibson's complaint stated a claim for common law conversion in addition to statutory conversion.

At trial, BOA made a motion for a directed verdict on several grounds, including the preclusion of Gibson's claims by the three-year statute of limitations for tort actions, S.C.Code Ann. § 15-3-530(5) (2005). The trial court granted BOA's directed verdict motion on all causes of action as they related to the ten unexplained withdrawals that occurred before Mitchell's relocation to South Carolina. The trial court based this ruling on the ground that the corresponding bank statements were mailed to Mitchell at her Missouri address, providing her with notice of the withdrawals within just a few weeks and, thus, the statute of limitations barred Gibson's claims as to those particular withdrawals. As to the remaining six unexplained withdrawals, the trial court denied BOA's directed verdict motion on the negligence and common law

conversion claims, concluding that whether the February 7, 2000 and June 9, 2000 account statements placed Mitchell on notice that she had a claim against BOA was a question of fact for the jury. The trial court granted BOA's directed verdict motion as to Gibson's statutory conversion claim.

The jury returned a verdict against BOA on the negligence claim for $55,510.18 in actual damages and $40,000 in punitive damages. The jury returned a verdict for BOA on Gibson's common law conversion claim. BOA filed a motion for a JNOV, but the trial court denied the motion. This appeal followed.

## ISSUE ON APPEAL

Was Gibson's negligence claim barred by the statute of limitations?

## STANDARD OF REVIEW

"When reviewing the denial of a motion for directed verdict or JNOV, this Court applies the same standard as the trial court." *Gadson ex rel. Gadson v. ECO Serv.s of S.C., Inc.,* 374 S.C. 171, 175, 648 S.E.2d 585, 588 (2007). The Court is required to view the evidence and inferences that reasonably can be drawn from the evidence in the light most favorable to the non-moving party. Id. at 175–76, 648 S.E.2d at 588. The motions should be denied when the evidence yields more than one inference or its inference is in doubt. Id. at 176, 648 S.E.2d at 588. "An appellate court will only reverse the [trial] court's ruling when there is no evidence to support the ruling or when the ruling is controlled by an error of law." *Id.*

## LAW/ANALYSIS

■ BOA argues that the trial court erred in denying its motions for a directed verdict and JNOV on the ground that Gibson's negligence claim is barred by the statute of limitations. We agree.

■ The limitations period of S.C.Code Ann. § 15–3–530(5) (2005), which is the applicable limitations period for a negligence claim, begins to run when the plaintiff "knew **or by the exercise of reasonable diligence** should have known that he

had a cause of action." S.C.Code Ann. § 15–3–535 (2005) (emphasis added). In other words, the clock starts running when the facts and circumstances of an injury would put a person of common knowledge and experience on notice that some claim against another party might exist. *Burgess v. Am. Cancer Soc'y, S.C. Div., Inc.,* 300 S.C. 182, 186, 386 S.E.2d 798, 800 (Ct.App.1989).

The standard as to when the limitations period begins to run is objective rather than subjective. *Burgess,* 300 S.C. at 186, 386 S.E.2d at 800. Therefore, the limitations period "begins to run when a person **could or should have known,** through the exercise of reasonable diligence, that a cause of action might exist in his or her favor, rather than when a person obtains actual knowledge of either the potential claim *or of the facts giving rise thereto.*" Id. (emphasis in original).

> The exercise of reasonable diligence means simply that an injured party must act with some promptness where the facts and circumstances of an injury would put a person of common knowledge and experience on notice that some right of his has been invaded or that some claim against another party might exist. The statute of limitations begins to run from this point and not when advice of counsel is sought or a full-blown theory developed.

*Grillo v. Speedrite Products, Inc.,* 340 S.C. 498, 503, 532 S.E.2d 1, 3 (Ct.App.2000) (quoting *Snell v. Columbia Gun Exch. Inc.,* 276 S.C. 301, 303, 278 S.E.2d 333, 334 (1981)).

> A key element in the reasonable diligence test is "notice." The fact that an injured party may not comprehend the full extent of the damage is immaterial. . . . Under section 15–3–535, the statute of limitations is triggered not merely by knowledge of an injury, but by knowledge of facts, diligently acquired, sufficient to put a person on notice of the existence of a cause of action against another. This is an objective, not a subjective, determination.

*Id.* (citations omitted).

When there is no conflicting evidence or when only one reasonable inference can be drawn from the evidence, the determination of when a party knew or should have known that he or she had a claim becomes a matter of law to be

decided by the trial court. *Cf. Johnston v. Bowen*, 313 S.C. 61, 65, 437 S.E.2d 45, 47 (1993) (finding grant of summary judgment in medical malpractice case was proper based on statute of limitations for medical malpractice claim because even taking the facts in the light most favorable to the plaintiff, only one reasonable inference existed as to when the plaintiff knew or should have known she had a claim).

Here, it is disputed as to when Mitchell or Gibson received the statements for March 2000, April 2000, and May 2000, which showed the last six unexplained withdrawals. However, it is undisputed that Mitchell received the February 2000 and June 2000 statements by mid-June 2000, and those statements showed a depletion of the money market and checking accounts totaling $47,661.82.[4] Nonetheless, the trial court concluded that whether the February and June statements placed Mitchell on notice that she had a claim against BOA was a question of fact for the jury.

The evidence relevant to Mitchell's notice of an existing claim is undisputed. Mitchell and Gibson received the February 2000 and June 2000 statements by mid-June 2000. Further, although Gibson's daughter, Elizabeth Chanter, gave her opinion as a lay witness that those statements did not indicate that "somebody's taking the money," she did admit that if someone were reviewing those statements to determine account balances, they would have noticed a combined depletion approximating $50,000 in the checking and money market accounts.[5] Moreover, a simple inquiry of the co-owner of these accounts, Lucille Gilda, would have eliminated any doubt over whether she was responsible for any of the withdrawals in question.

Even when the evidence is viewed in the light most favorable to Gibson and Mitchell, there is only one reasonable inference as to when they knew or should have known that

---

**4.** The February 7 statement showed a balance of $43,961.37 for the money market account and a balance of $25,526.97 for the checking account. The June 9 statement showed an approximate balance of $1,288.53 for the money market account and a balance of $20,537.99 for the checking account.

**5.** Although Chanter is a CPA, she testified as a fact witness. She was never qualified as an expert witness.

they had a claim against BOA—when Mitchell received the June 9 statement. Cf. S.C.Code Ann. § 36–1–201(25) (2003) (stating that in South Carolina's version of the U.C.C., a person has "notice" of a fact when (a) he has actual knowledge of it; (b) he has received a notice or notification of it; or (c) from all the facts and circumstances known to him at the time in question he has reason to know that it exists).

Therefore, the determination of when Mitchell or Gibson knew or should have known that they had a claim was a matter of law, and the trial court erred in submitting the question to the jury. *See Gadson,* 374 S.C. at 175–76, 648 S.E.2d at 588 (holding that the court is required to view the evidence and reasonable inferences in the light most favorable to the nonmoving party but concluding that the trial court's ruling may be reversed when there is no evidence to support the ruling or when the ruling is controlled by an error of law); *cf. Johnston,* 313 S.C. at 65, 437 S.E.2d at 47 (finding grant of summary judgment in medical malpractice case was proper based on statute of limitations for medical malpractice claim because even taking the facts in the light most favorable to the plaintiff, only one reasonable inference existed as to when the plaintiff knew or should have known she had a claim).

Gibson's counsel cites *Citizens & S. Nat'l Bank of S.C. v. State Budget & Control Bd.,* 246 S.C. 140, 142 S.E.2d 874 (1965), to support the argument that receipt of a bank statement alone is not enough to trigger the running of the statute of limitations and that until the depositor receives the forged item for inspection, the statute cannot begin to run. However, the cited opinion does not truly support this argument because in that case, the South Carolina Supreme Court did not have the question of the adequacy of the statement alone squarely before it. Rather, the *Citizens* opinion actually supports BOA's argument that Mitchell's receipt of the June 9 statement placed her on notice that she had some type of claim. The Court in *Citizens* quoted with approval the following language from *Kan. City Title & Trust Co. v. Fourth Nat'l Bank in Wichita, Kan.,* 135 Kan. 414, 10 P.2d 896, 901 (1932):

[W]here the bank renders a statement to the depositor showing him the status of his checking account, it says to him in effect: *'This bank owes you this stated balance, and no more.' Such statement may fairly be construed as a*

*notice* that any claim the depositor may make in excess of the stated balance would be resisted by the bank. And *in view of the situation the depositor's formal demand* for a greater sum would be *unnecessary* to perfect the depositor's cause of action, and likewise *to set in motion the Statute of Limitations.* If this is not the legal effect of the bank's monthly statement to its depositor, it is not apparent what function the monthly statement performs.

*Citizens,* 246 S.C. at 144, 142 S.E.2d at 875 (quoting *Kan. City,* 10 P.2d at 901)) (emphasis added).

In the instant case, a review of the account balances in the June 9, 2000 statement would have prompted a reasonable depositor to contact BOA and, at the very least, request BOA to send her the statements for account activity between time periods shown on the February 7 statement and June 9 statement. If, after making a reasonable inquiry of the accounts' co-owner, Lucille Gilda, as to her activities on the accounts between February 7 and June 9, Mitchell disagreed with the bank's representation of what it owed her as of June 9, she was then on notice that she had some type of claim for any perceived discrepancy, even if she did not know the precise details behind the discrepancy. *See Grillo,* 340 S.C. at 503, 532 S.E.2d at 3 (stating that the fact that an injured party may not comprehend the full extent of the damage is immaterial and that the statute of limitations is triggered by knowledge of facts, diligently acquired, sufficient to put a person on notice of the existence of a claim).

Gibson argues that Mitchell could have inferred that Gilda had withdrawn the money and that, therefore, the June 9 statement's representation of the account balances could not have placed Mitchell on notice that previous withdrawals were unauthorized or that she might have a claim for any perceived discrepancies. However, a reasonably diligent depositor would direct an inquiry to any co-owners of the accounts to determine if their activity on the accounts did in fact account for the shortfall.

Mitchell and Gibson were on notice of a claim by mid-June 2000. Thus, the statute of limitations expired by mid-June 2003. Gibson did not file the instant action until September 2003. As a result, Gibson's negligence claim against BOA

was barred by the statute of limitations. While we find the circumstances of this case troubling, we are constrained by the law. Statutes of limitations "are designed to promote justice by forcing parties to pursue a case in a timely manner." *State ex rel. Condon v. City of Columbia*, 339 S.C. 8, 19, 528 S.E.2d 408, 413 (2000). "Parties should act before memories dim, evidence grows stale or becomes nonexistent, or other people act in reliance on what they believe is a settled state of public affairs." *Id.* at 19, 528 S.E.2d at 413–14; *see also Moates v. Bobb*, 322 S.C. 172, 176, 470 S.E.2d 402, 404 (Ct.App.1996) (noting that statutes of limitations have long been respected as fundamental to a well-ordered judicial system and that they embody important public policy considerations in that they stimulate activity, punish negligence, and promote repose by giving security and stability to human affairs). Therefore, our courts are unable to entertain Gibson's negligence claim against BOA.

## CONCLUSION

Accordingly, the trial court's denial of BOA's motions for a directed verdict and JNOV is

**REVERSED.**

SHORT and THOMAS, JJ., concur.