No. 49,695

HARTFORD FIRE INSURANCE COMPANY (*Plaintiff*), *Appellee,* v. WESTERN FIRE INSURANCE COMPANY (*Defendant*), MANLEY LEASING COMPANY, INC. (*Intervenor*), *Appellants.*

(597 P.2d 622)

Opinion filed July 14, 1979.

*Glenn E. McCann,* of Knipmeyer, McCann, Fish & Smith, of Kansas City, Missouri, argued the cause, and *Edward L. Smith,* of the same firm, was with him on the brief for defendant-appellant Western Fire Insurance Company, and *O. P. Peterson, Jr.,* of Kansas City, was on the same brief and argued the cause for intervenor-appellant Manley Leasing Company, Inc.

.

*James P. Nordstrom,* of Fisher, Patterson, Sayler & Smith, of Topeka, argued the cause and was on the brief for the plaintiff-appellee.

The opinion of the court was delivered by

McFARLAND, J.: This is an appeal by defendant Western Fire Insurance Company and intervenor Manley Leasing Company, Inc., from judgments entered in favor of plaintiff Hartford Fire Insurance Company (1) on Hartford's petition against Western in the amount of $18,420.46, and (2) on the claim against Hartford filed by Manley.

The facts are complex and by virtue of the issues raised on appeal they must be set forth in considerable detail.

Francis B. Freeman, d/b/a Freeman Construction Company, operated out of Archie, Missouri. Freeman, for at least two years prior to December, 1971, maintained insurance on his equipment with Western in an inland marine policy, with the current policy being due to expire on December 17, 1971. The policy specifically insured, among other items of equipment, a D-8 Caterpillar tractor (bulldozer) for $20,000. The bulldozer was owned by Manley and leased to Freeman. As a part of the lease agreement Freeman was required to keep the bulldozer insured. The Western policy contained various loss payable clauses, including one in favor of Manley.

In 1970-71, Freeman was experiencing a serious financial bind. A principal creditor was the First National Bank of Butler, Missouri. The bank became concerned with Freeman's financial health and entered into an agreement with Freeman whereby Steven Buerge, son of the bank's president and an employee of the bank, took over the management of Freeman's business affairs. The record is unclear as to when this changeover occurred, but it was no later than the early months of 1971. During all relevant times herein Buerge was then serving as business manager and running the business affairs of Freeman from Buerge's office in Butler. Freeman continued to maintain the office in Archie.

In the fall of 1971 Buerge decided it might be desirable to place Freeman's insurance with another company. Conveniently, there was a Hartford agent, G. J. Six, in an office adjacent to Buerge. The two men discussed the matter and Buerge turned over the Freeman insurance file to Six in order that Six could review same and determine what Hartford could offer as replacement insur-

ance for the current Western policy upon its expiration. Almost daily discussions occurred on the subject. Buerge agreed to Hartford's becoming the insurer for Freeman.

In early December, 1971, a Western agent, Jim Schneider, of Rich Hill, Missouri, visited Buerge in Buerge's office to discuss renewal of the policy (he had the Freeman account). He was told by Buerge that the policy was not going to be renewed and that he was placing the insurance with another company. A heated conversation followed, with Schneider denying Buerge's authority to transfer the insurance. The discussion terminated with Schneider stating he was going to contact Freeman.

Freeman, who was subsequently contacted by Schneider, told Schneider he and Buerge had discussed changing insurance companies but that no decision had been reached. In a later conversation between Freeman and Buerge the transfer to Hartford was agreed upon. Schneider meanwhile made no further contacts with either Buerge or Freeman, but directed the Western home office to renew the policy in anticipation of a renewal. In accordance with the instructions from its agent, Western issued a renewal policy, with Schneider forwarding it to Freeman at his office in Archie, and a copy of same was sent to Manley. The agent, Schneider, started billing Freeman, said bills being directed to Buerge's office in Butler. The Hartford policy was issued as a blanket policy effective December 17, 1971; it insured the D-8 bulldozer under the equipment provision totaling $234,000. The policy did not have a Manley loss payable provision.

On January 22, 1972, the D-8 bulldozer was damaged by fire in Manhattan, Kansas. Freeman promptly filed a claim with Hartford for the loss. Sometime between January 22, 1972, and February 2, 1972, Schneider, concerned that no premium had been paid on the Western policy, visited the Freeman office in Archie to demand payment of the premium or return of the policy. He was told by Freeman that the Western policy had not been renewed, that Hartford had the insurance, and that the Western policy should be canceled. The policy was returned to Schneider. After the policy had been returned to Schneider, but during the same conversation, Schneider was advised for the first time of the damage to the bulldozer and that a claim had been filed with Hartford. No premium was ever paid to Western for the 1971-72

renewal and the policy was canceled "flat" back to December 17, 1971. No notice of such cancellation was ever sent to Manley, despite a requirement in the policy that such notice be given.

Hartford investigated the loss and contacted Western. Hartford took the position that Western had the primary coverage and that the Hartford policy was excess coverage only. Western denied the existence of a policy, but sent an adjuster to investigate. The bulldozer was removed from the loss site in Manhattan to Martin Tractor Company in Topeka where it was appraised. The Western and Hartford adjusters had some conversations in February relative to the situation. On February 22, 1972, the Western adjuster advised the Hartford adjuster that the Western policy had some loss payable clauses, but Hartford made no investigation relative to ascertaining the real owner. Freeman signed a sworn proof of loss, stating he was the owner. A meeting of the two adjusters and Freeman occurred (the exact date is impossible to determine, but it was prior to any payments by Hartford). At that meeting Freeman stated the Western policy had not been renewed, that Hartford was the sole insurer, and that he was making no claim against Western. Western advised Hartford it was denying coverage on the ground that no policy was in effect.

On March 2, 1972, Hartford directed its claims officer to settle with Freeman, the following being a part of its inter-office memorandum:

"There is no doubt in my mind that the Western policy was in effect at the time of the loss, i.e., it had not been canceled at the time this loss occurred. Whether or not we can prevail upon Western Fire to assume their rightful liability for this damage is another matter. We cannot penalize our insured by refusing payment under our contract if he is unable to collect from Western Fire. We acknowledge that we have a valid contract and although it is on a blanket basis, I don't think we should withhold our payment any longer pending clarification of the Western Fire policy. "Therefore, you are authorized to conclude this loss on the basis of the constructive total loss."

In March, 1972, Hartford settled with Freeman by paying him $18,000 and allowing him to retain the salvage (value $2,000). In addition, Hartford paid the cost of transferring the bulldozer to Topeka and its appraisal at Martin Tractor Company (total cost $540.56).

In 1973 Manley learned of the loss of the bulldozer and of the Hartford policy. In November, 1973, the action herein was filed by Hartford against Western on Freeman's subrogation to recoup

the $18,540.56 it had paid in settlement, plus investigation expense. In January, 1974, Manley filed suit against Western to recover the value of the bulldozer. The two cases were consolidated. Subsequent thereto, Western paid Manley $7,500 in settlement of Manley's claim against Western, but Manley specifically reserved the right to proceed against Hartford and others. Western then had subrogation rights from Manley for the $7,500 it had paid, and counterclaimed for same against Hartford. As intervenor in the Hartford-Western action, Manley made claim against Hartford for $12,500.

On trial of the case the court entered judgment in favor of Hartford against Western in the amount of $18,420.46 ($18,000 paid in settlement, plus $540.56 investigation expense, less earned premium on Western policy). Hartford was given judgment on the Manley claim against it and nothing was said about the Western counterclaim for $7,500. From the trial court's findings and conclusions it is apparent the court was ruling in favor of Hartford and against Western. Nothing would be gained by remanding the case to the district court for an express ruling on the counterclaim. From the judgments, Manley and Western appeal.

Some of the foregoing statement of facts and certain other facts stated elsewhere in this opinion are in areas where the trial court made no findings of fact. These facts are not substantially in dispute and do not require a weighing of the evidence to determine; however, they are significant to this action. Further, the trial court made certain findings of fact which are not in harmony with the facts stated herein. We have carefully reviewed the record and hold those findings to be unsupported by substantial competent evidence. It would only serve to confuse an already complicated factual situation to specifically go through each of the trial court's findings of fact and designate in this opinion the status of each such finding. It is sufficient to state that all findings of the trial court which are inconsistent with and contrary to the facts expressed herein are set aside for the above stated reason.

We will first deal with the propriety of the judgment entered in favor of Hartford against Western.

The first question is whether or not the Western renewal policy issued December 17, 1971, was a valid policy which was in effect on January 22, 1972 (date of the bulldozer damage). Prior to

December 17, 1971, Freeman, the named insured, had decided not to renew the policy and had made all necessary arrangements to purchase insurance with another company (Hartford). The Hartford agent handling the selling and issuance of the Hartford policy knew the Hartford policy was to replace the Western policy and was not supplemental thereto. Prior to the expiration of the Western policy the Western agent (Schneider) sought renewal of the policy and was told another company would be writing the insurance and the Western policy would not be renewed. The Western agent ordered renewal of the policy on the hope Freeman would alter his position and accept same. No premiums were paid to Western and the new Hartford policy went into effect on December 17, 1971, which was also the Western policy's expiration date. The Western agent did not know the Hartford policy had been issued, but did know he had been told (1) that the policy would not be renewed, and, subsequently, (2) that the matter had not finally been decided. Under such circumstances the agent ordered the renewal in anticipation of successfully retaining the account, as the trial court found. The agent delivered the policy, expecting to receive either the return of the policy or premiums therefor. When neither was forthcoming, he personally went to the insured's place of business and demanded premium or policy. He was told the renewal had never been agreed to, the policy should be canceled, and he was personally handed the policy. He was further advised that Hartford had the insurance, that the bulldozer had been damaged, and that a claim had been filed with Hartford. The insured, Freeman, steadfastly maintained this position throughout his claim negotiations with Hartford.

The trial court found:

"4. The receipt and retention by the applicant of a policy tendered or sent him by the insurer without objection to the policy is binding as an acceptance. Couch on Insurance 2d § 12:8."

The elements of a contract of insurance are set forth in 44 C.J.S., Insurance § 227, pp. 941-43, as being:

"[A] subject matter, a risk or contingency insured against, and the duration thereof; a promise to pay or to indemnify and a promise to pay or indemnify in a fixed, determinable or ascertainable amount; a consideration for the promise, known as the premium, and the period of payment thereof; *and an agreement, or meeting of the minds of the parties, and such agreement or meeting of the minds must be on all the foregoing essential elements.*" (Emphasis added.)

With respect to renewals of existing insurance policies, it is stated in § 283, pp. 1126-27:

"A binding contract of renewal must be clearly established, and must have all the essentials of a valid contract, as in the creation of the contract in the first instance . . . . Thus a renewal *cannot be effected or consummated without the mutual assent of the parties and a meeting of the minds of the parties on all the essentials of the contract, and a new consideration. A mere custom of companies or their agents in certain localities to renew, without request, is not sufficient to establish a renewal, unless it is of such a nature as to be binding on insured as well as on insurer.*" (Emphasis added.)

The general rules on acceptance of a policy are set forth in 1 Couch on Insurance 2d, §§ 12:8 *et seq.*:

§ 12:8. In general.

"The receipt and retention by the applicant of a policy tendered or sent to him by the insurer, without notice of objection to the policy, is binding as an 'acceptance,' especially where accompanied by payment of the initial premium subsequent to the delivery of the policy, provided there is no fraud, accident, or mistake. The obligee of a bank deposit guaranty bond sufficiently evidences an acceptance thereof by paying the premium thereon.

"Of course, a policy cannot be said to have been accepted where the insured had no knowledge of its existence. An acceptance, moreover, to be effective, must precede loss."

§ 12:13. Communication of acceptance or rejection.

"Formal acceptance of a policy is not rendered necessary merely because the insurer furnished a form on which to notify it that the policy had been delivered. Communication of the acceptance is, however, essential to the completion of the contract, where the policy was received unsolicited by the insured named therein, since in such a case the submission of the policy to the insured is nothing more than a proposal emanating from the insurer. In some instances, moreover, in which a policy is sent on approval, a communication of the approval appears to be essential to the completion of the contract.

"As hereinbefore appears, the communication by the applicant of his rejection of a policy may be essential to avoid the effect of his retention of the policy as an acceptance."

§ 12:15. Renewal policy.

"A mere mental resolution is not sufficient as an acceptance of a policy offered as a renewal contract; the acceptance must be made by some unequivocal word or conduct such as the communication of the acceptance to the insurer's agent or the payment of the premium called for by the contract.

"Mere delay in rejecting a receipt for renewal of an accident policy does not amount to an acceptance which will continue the policy in force. However, it has been held that where the renewal receipt is unconditional, and was mailed pursuant to a long and well-established custom that protection should date from delivery of the receipt, acceptance is implied from retention by the insured of the

receipt. So, the receipt and retention by insured of a renewal policy creates a binding contract."

Missouri law is in accord with Kansas law that delivery of a renewal policy without request is merely an offer or proposal that must be accepted by the insured before a contract of insurance exists. *Marker v. Preferred Fire Ins. Co.,* 211 Kan. 427, 437, 506 P.2d 1163 (1973); *Eicks v. Fidelity & Casualty Co.,* 300 Mo. 279, 292, 253 S.W. 1029, 1033 (1923); see 1 Couch 2d, § 12:3.

In *Eicks,* 300 Mo. at 291-92, the Missouri Supreme Court held:

"Insurance is a matter of contract and is governed by the rules applicable to contracts. In the application of these rules it has been held in numerous cases upon accident insurance policies that the delivery of a renewal receipt by the insurer to the insured without a request by the insured, is an offer or proposal, which must be accepted by the insured before there can be a contract of insurance effected. [Citations omitted.] Clearly, the renewal of such a policy cannot be imposed upon the insured against his will. His assent is necessary to the proposal, to make it binding, but his assent need not be manifested in express or formal terms."

The court in *Eicks* held acceptance was implied by the "long established dealings of the parties."

Except for not immediately returning the policy, every significant statement and act of the insured is totally consistent with his nonacceptance of the policy. The delay in returning the policy is at least partially explained by the fact it was delivered to the insured's Archie, Missouri, office, whereas the insured's business affairs, including insurance, were being handled by the Butler, Missouri, office.

We hold that under the circumstances herein the delivery of the renewal policy by Western constituted merely an offer to insure which was not accepted by Freeman, despite the delay in returning the policy. Neither Western nor Freeman acquired any rights thereby. There was never a meeting of the minds; hence, there was no valid renewal policy as applied to Freeman and Western.

Hartford has no privity of contract with Western. Its sole claim against Western evolves from its subrogation rights from Freeman. Hartford stands in the shoes of Freeman and any defenses against Freeman are good against Hartford, the subrogee. *Shelman v. Western Casualty & Surety Co.,* 1 Kan. App. 2d 44, Syl. ¶5, 562 P.2d 453, *rev. denied* 223 Kan. clxxii (1977). Freeman and Western are in complete agreement that there was no acceptance of the renewal policy and that Western had no valid policy of

insurance in effect, a position which is borne out by the facts surrounding the alleged renewal. It therefore follows that the trial court erred in granting judgment against Western on Hartford's petition and the judgment is reversed.

Various other issues are raised by Western as to additional defenses it claims. By virtue of the result herein reached these need not be determined.

We turn now to Western's counterclaim against Hartford. The trial court ruled against Manley on its claim and, inasmuch as Western's counterclaim arises from subrogation rights received from Manley for the $7,500 settlement, inherent in the trial court's ruling was a denial of Western's counterclaim, although this is not expressly stated.

It is undisputed that the bulldozer was worth $20,000 and that Manley was the owner thereof at the time of loss. It is likewise undisputed that Hartford had a policy in force at the time insuring the bulldozer.

The precise legal theory on which Manley's action against Western was based is not before us as Western settled with Manley for $7,500. The agreement of Manley and Western for settlement of the litigation is as follows:

"Come now the parties hereto, . . . and hereby stipulate and agree that the above styled case should be, and is hereby, dismissed with prejudice by reason of the fact that the parties hereto have entered into an amicable settlement of this controversy. It is further stipulated that Manley Leasing Co., Inc. and its successors, are specifically releasing only their claims against Western Fire Insurance Company. Manley Leasing Company, Inc. expressly reserves any claim, right, or cause of action that it may have against any individual, organization, corporation, or insurance company other than Western Fire Insurance Company, and Manley Leasing Company, Inc. expressly reserves any right it may have to proceed against any other party.

"It is further stipulated by Manley Leasing Company, Inc. that this settlement is a compromise of a doubtful and disputed claim, and that the settlement between the parties hereto is not to be construed as an admission of liability nor the admission of a valid contract of insurance in favor of Manley Leasing Company, Inc.

"It is further stipulated that Western Fire Insurance Co. expressly denies liability in this matter and further expressly denies that there is the existence of a valid contract of insurance and that they intend to merely avoid further litigation in respect to the claim of Manley Leasing Company, Inc.

"It is further stipulated by Manley Leasing Company, Inc. that Western Fire Insurance Co. shall be subrogated to the extent of the settlement in this matter, to those rights, claims, actions, or causes of action that Manley Leasing Company, Inc. may have against any other person, firm, corporation or insurance company

by reason of the destruction by fire of one D-8 Caterpillar Tractor Dozer, Serial No. 15A3230, which was destroyed on January 22, 1972.

"It is further stipulated that any and all costs of this action are to be assessed against Western Fire Insurance Co."

Subrogation is the substitution of another person in the place of the creditor so that the person in whose favor it is exercised succeeds to the rights of the creditor in relation to the debt. *Criss v. Folger Drilling Co.,* 195 Kan. 552, 556, 407 P.2d 497 (1965).

There are two kinds of subrogation, one of which is termed "conventional," and the other, in contradistinction, "legal," or by reason of its origin and basis, "equitable." 73 Am. Jur. 2d, Subrogation § 2, p. 599; see also *Kansas City Title & Trust Co. v. Fourth Nat'l Bank,* 135 Kan. 414, 10 P.2d 896 (1932). In *United States Fidelity & Guaranty Co. v. First State Bank,* 208 Kan. 738, 749, 494 P.2d 1149 (1972), this court said:

"We have long recognized the distinction between 'conventional' subrogation, based on contract, and 'legal' or 'equitable' subrogation which arises by operation of law without regard to any contractual relationship. We once put it this way:

" '. . . Subrogation is a creature of equity invented to prevent a failure of justice, and is broad enough to include an instance in which one party is required to pay what is, between them, the debt of another. It does not depend upon contract nor the absence of contract, but is founded upon principles of natural justice. [Citations omitted.]' (*Blitz v. Metzger,* 119 Kan. 760, 767, 241 Pac. 259.)

"And, more directly, in *United States Fidelity & Guaranty Co. v. Maryland Cas. Co.,* 186 Kan. 637, 643, 352 P.2d 70, we said:

" 'It has recently been recognized that the right to legal subrogation as distinguished from conventional subrogation arises by operation of law and does not depend upon contract, assignment or agreement. (*Fenly v. Revell,* 170 Kan. 705, 709, 228 P.2d 905.) . . .' "

*New Hampshire Ins. Co. v. Kansas Power & Light Co.,* 212 Kan. 456, 510 P.2d 1194 (1973), contains the following language:

"Once an obligation to pay the loss was established it was not necessary for the plaintiffs to prove a written contract for subrogation. The right of subrogation of an insurer arises by operation of law without regard to whether there is any provision in the insurance policy or any writing declaring such right; it is a creature of equity and does not spring from contract. See, *United States Fidelity & Guaranty Co. v. First State Bank,* 208 Kan. 738, 494 P.2d 1149, and cases cited therein."

At first blush, this would appear to alter existing case law, but on closer reading it simply states that legal subrogation exists between insurer and insured, regardless of whether the express contract provision required for conventional subrogation exists.

Hartford argues that Western is a mere volunteer and cannot recoup its payment. The defense that the party claiming the rights of subrogation is a volunteer is available against a claim of legal subrogation in appropriate circumstances, but not against a claim based on conventional subrogation. 73 Am. Jur. 2d, Subrogation § 23, p. 613, citing *Kansas City Title & Trust Co. v. Fourth Nat'l Bank,* 135 Kan. 414.

To illustrate the difference between conventional and legal subrogation, let us use the present factual situation. Western could have claimed subrogation in Manley's claim against Hartford on three theories: (1) On the claim asserted; that is, arising from the actual subrogation agreement of the parties; (2) by the subrogation clause in the Western policy (although Western would be hard pressed to deny the policy on one hand and assert subrogation on the other); and (3) simply by virtue of having paid part of the debt. Theories (1) and (2) would be seeking recovery on conventional subrogation; that is, by virtue of the terms of legal contract or assignment creating such a right. Theory (3) would be seeking a legal subrogation, based not on any agreement granting subrogation but simply on the acts and relationship of the parties. Only in theory (3) would the claim that Western was a volunteer be a defense.

In *Criss v. Folger Drilling Co.,* 195 Kan. at 556, this court stated:

"In *Crippen v. Chappel,* 35 Kan. 495, 11 Pac. 453, it was held that where a stranger, a mere volunteer, a mere intermeddler, pays the debt of another, he cannot be subrogated to the rights of the creditor. In the opinion the court, speaking of the doctrine of subrogation, said:

"'. . . It always requires something more than the mere payment of the debt in order to entitle the person paying the same to be substituted in the place of the original creditor. It requires an assignment, legal or equitable, from the original creditor, *or* an agreement or understanding on the part of the party liable to pay the debt, that the person furnishing the money to pay the same shall in effect become the creditor, *or* the person furnishing the money must furnish the same either because he is liable as surety or liable in some other secondary character, or for the purpose of saving or protecting some right or interest, or supposed right or interest, of his own. . . .' (p. 499.)" (Emphasis added.)

Without using the terms "legal" and "conventional" the court is applying the same criteria by making it sufficient if the original creditor gives an assignment, but requiring other conditions be met if no written assignment exists.

We therefore conclude that Western has a valid conventional subrogation right from Manley which may be asserted against Hartford. Both Manley and Western are standing in Manley's shoes. *Shelman,* 1 Kan. App. 2d 44, Syl. ¶ 5. This being the case, we turn now to Manley's claim against Hartford, which determination will be dispositive of both Western's counterclaim and Manley's claim.

Manley's first claim against Hartford rests on the theory that it was a third party beneficiary of the Hartford policy. Manley seeks to reform the policy to indicate it is a loss payee or additional insured.

The lease between Manley and Freeman required the lessee (Freeman) to "keep said leased property insured at lessee's cost for the full insurable value thereof, against damage thereto by fire, water, windstorm, explosion or other casualty, and every policy by which such insurance is effected shall contain a loss clause payable to lessor as its interest may appear."

In the factual situation surrounding the acquisition and insuring of the bulldozer, certain undisputed facts need to be stated. Freeman's 1970-71 Western policy listed specific items of equipment which were being insured. Various loss payable clauses are attached thereto, one of which is in favor of Manley. None of the loss payable clauses, however, indicate which particular equipment is involved therein. Significantly, the bulldozer in question was not included in the itemized equipment list at the time of issuance of the policy, although the Manley loss payable clause was a part of the policy at the time of issuance (December 17, 1970). One can only conclude that Manley had an interest in other insured Freeman equipment. The bulldozer was leased to Freeman by Manley on October 29, 1971. Prior to that time it had been owned by Freeman and this was a sale-leaseback arrangement. There is no evidence of when the bulldozer was originally acquired by Freeman, nor is there any indication it was insured by Freeman while he owned it. On December 15, 1971, the Western agent requested that the bulldozer be added to the Western policy for $20,000 as of August 1, 1971. This request was received by the Western home office on December 16, 1971—one day before the policy expired. From the evidence it is clear that the Hartford agent had already received and reviewed the Western policies and

made application, as the Hartford policy was effective December 17, 1971, and his testimony was to the effect that such work was completed in the first half of December. Therefore, a review of the existing Western policy would not have revealed anything relative to the bulldozer. The addition of the bulldozer to the Western policy resulted in an additional premium being charged. Manley's assertion that Hartford knew of the Manley interest in the bulldozer by review of prior Western policies and statements of premiums paid is unfounded.

There is evidence that Buerge may have told the Hartford agent the true ownership of the bulldozer, but the Hartford agent does not recall such a conversation. Buerge testified it was his intent that Manley's interest in the bulldozer be protected in the new Hartford policy by an inclusion therein of an appropriate loss payable clause. There is no written evidence presented regarding what was to be included in the policy relative to the bulldozer in the way of the insurance application, agent's notes, or Buerge's notes. The bulldozer was admittedly insured by Hartford in the blanket equipment coverage.

The trial court found that Hartford had no knowledge of Manley's interest at the time of contracting—a finding which is supported by substantial competent evidence and will not be disturbed on appeal.

The trial court concluded as follows:

"Manley does not have any contract rights against The Hartford, since the contract did not confer any benefit upon any third party, and Manley Leasing has the burden of proof that they were the intended beneficiary of the insurance contract, *Black and White Cabs of St. Louis v. Smith* supra."

As authority for this conclusion the trial court relied, *inter alia*, on the following statement from *Black and White Cabs of St. Louis, Inc. v. Smith*, 370 S.W.2d 669, 675 (Mo. App. 1963):

"Where the contract creates a right in favor of a third person, the law presumes that the party to the contract intended to confer benefits on the third person and the third party beneficiary has the right to enforce the contract although the contract also works to the advantage of the parties thereto and although the actual purpose motivating the parties in making the provisions in favor of the third party was a purely selfish one of benefiting or protecting themselves rather than of benefiting the third person."

The factual situation in *Black and White Cabs* involved an agreement between stockholders that any stockholder deciding to sell stock in the corporation would first offer the stock to the

corporation. The corporation was not a party to the contract, but sought to enforce it as a third party beneficiary. The Missouri court held the corporation was a donee beneficiary and could enforce the same.

Before the issue is reached of whether a third party may directly enforce a contract from which he would benefit, the third party must show the existence of some provision in the contract that operates to his benefit. He need not be personally named in the contract, but he must be a member of a designated class or identifiable in some manner as a benefited person. For a common example, let us take a bond made between owner and contractor to insure payment of materialmen. A materialman supplying materials for the contractor's work, although not specifically named, can be sufficiently identified to pass this threshold test and can proceed to the issue of whether he can maintain an action for specific performance of the contract. In the case before us, unlike *Black and White Cabs,* there is no provision in the contract which even mentions the third party, let alone confers rights to him; accordingly, he fails to meet the threshold test. He is, in essence, attempting to have the contract reformed to include what one party thereto intended to include in it and then have specific performance against the other party on the reformed contract. The fact a printed portion of the contract contains the following provision does not alter the situation:

"1. This Endorsement Covers (Coverage under paragraph 1. b. hereof is afforded only if so specified in the Declarations):

"a. Contractor's Equipment, the property of the Insured, including Contractor's Equipment being purchased under lease-purchase agreement;

"b. The Insured's legal or contractual liability for loss or damage, caused by a peril insured against, to Contractor's Equipment leased or rented from others."

The declaration of leased equipment requisite for coverage was not made. Further, the coverage, even if declaration had been made, was limited to Freeman's "legal and contractual liability," and apparently no action has ever been brought to determine same.

Manley's final claim against Hartford rests in the negligent handling of the loss claim by Hartford. This relates to the fact that Hartford, after knowledge that a prior policy had some loss payable clauses attached to it, settled with Freeman without further investigation. The trial court found Hartford to be negligent in this respect.

Inasmuch as Hartford's sole insured was Freeman it is difficult to see how this negligence could create any new rights in Manley—a stranger to the policy. Appellants cite no authority for the proposition that an insurance company must seek out uninsured persons who might have an interest in property insured by another or else be liable to the uninsured person. Manley would have had no new rights created against Hartford by knowledge of either the loss or the lack of insurance protection of its interest. Such knowledge by Manley would have placed it in a better position as against Freeman, but this does not create liability in Hartford in favor of Manley.

We therefore conclude the trial court properly entered judgment in favor of Hartford on Manley's claim, and (by inference) properly denied Western's counterclaim.

All points raised have been considered, but by virtue of the results herein reached need not be set forth.

The judgment is affirmed in part and reversed in part.

PRAGER, J., not participating.