(117 P.3d 880)

No. 93,285

NATIONAL CITY MORTGAGE CO., d/b/a COMMONWEALTH UNITED MORTGAGE COMPANY, *Appellee*, v. KEVIN D. ROSS, a/k/a KEVIN DALE ROSS; TERRI ROSS, *et al.*, *Defendants;* and LEON A. BOLDRIDGE and SANDRA BOLDRIDGE, *Appellants*, v. NATIONAL CITY MORTGAGE CO., d/b/a COMMONWEALTH UNITED MORTGAGE COMPANY; KEVIN D. ROSS; TERRI ROSS; MATTHEW TUMBERGER; and ELAINA TUMBERGER, *et al.*, *Third-party Defendants*.

Opinion filed August 12, 2005.

*Charles S. Scott, Jr.*, of Kansas City, Missouri, for appellants.

*Linda S. Mock*, of Overland Park, for appellee.

Before MALONE, P.J., GREEN and BUSER, JJ.

GREEN, J.: Leon and Sandra Boldridge appeal from the judgment of the trial court determining that the mortgage of National City Mortgage Co. (NCM) was entitled to be subrogated to the rights of two prior mortgagees which were discharged with the proceeds of NCM's loan and mortgage. The Boldridges purchased a home from Matthew and Elaina Tumberger under a contract for deed. When the Boldridges purchased the premises, two preexisting valid mortgages existed against the property. The Boldridges did not record their contract for deed.

The Tumbergers made a second sale of the property to Kevin and Terri Ross while the Boldridges were openly in possession of the property. To finance the purchase, the Rosses obtained a loan and a mortgage from NCM. On appeal, the Boldridges contend that the doctrine of subrogation was inapplicable in the case because of the negligence of NCM in failing to investigate the Boldridges' possession of the premises. The Boldridges further contend that their possession of the premises constituted constructive notice of their rights under their contract for deed. Nevertheless, as the trial court properly determined, the Boldridges have been enriched to the extent of the discharge of the two prior mortgages. As previously stated, the Boldridges' rights were subject to the two preexisting valid mortgages on the property. Moreover, the Boldridges have not shown that they have had to change or that they have been induced to change their position because of the satisfaction of the two prior mortgages. As a result, any negligence on the part of NCM in failing to make an adequate inquiry as to the Boldridges' possession of the premises does not bar NCM from the right of subrogation. Accordingly, we affirm.

On June 15, 2000, the Boldridges entered into a contract for deed with the Tumbergers to purchase the following described real estate in Johnson County, Kansas:

"Lot 203, Lakepointe, Third Plat, Shawnee, KS.
"More commonly known as: 21319 West 58th Street, Shawnee, Ks 66218."

The Tumbergers entered into the contract for deed through their agent, David Kostelec. The purchase price of the property was $165,000, which was based on the combined amounts of the two outstanding mortgages at the time. The Boldridges agreed to pay $500 at the time of execution and make installment payments of $1,602 a month directly to the mortgage companies. The contract for deed was never recorded with the register of deeds. From July 2000 to June 2001, the Boldridges made payments totaling $21,595.61, which included excess payments in the amount of $2,371.61.

In May 2001, NCM had a real estate appraiser appraise the property; the appraisal indicated that the Tumbergers were the occupants of the premises. When Leon Boldridge encountered the appraiser on the property, he identified himself and told the appraiser that he was the owner of the property. Leon also testified that the appraiser never entered the interior of the house during his inspection.

On June 8, 2001, the Tumbergers resold and conveyed the property by warranty deed to the Rosses. The Rosses secured a mortgage loan from NCM in the amount of $208,000. The Rosses executed a mortgage on the property to NCM as security for the loan. Both the warranty deed and the mortgage were recorded with the register of deeds' office of Johnson County on June 25, 2001.

Before granting a mortgage loan to the Rosses, NCM had a title report done on the property, which indicated that the Tumbergers were the owners of record. Nevertheless, NCM failed to verify much of the financial information associated with the loan application.

The Boldridges were unaware of the sale of the property to the Rosses and the mortgage to NCM. Because property taxes were coming due and back taxes had not been paid, Kostelec asked the Boldridges to agree to an addendum to the original contract for deed authorizing the refinancing of the property. The Boldridges agreed and authorized the property to be refinanced for the maximum amount of $173,685. Under this new agreement the Boldridges' monthly payments increased to $1,928.77.

The Boldridges were unaware the property had been refinanced until they began to receive mail and a welcome wagon basket for a Kevin Ross in late July 2001. When they asked Kostelec about this, he told them the mortgages on the property had been refinanced with NCM in the name of Kevin Ross.

Starting in August 2001, the Boldridges began making monthly payments to NCM in the amount of $1,928.77. They continued to make these payments until December 2001 when they discovered the amount of the new mortgage was $208,000. The Boldridges contacted Kostelec and told him that they would not make further payments until or unless the amount of the new mortgage was reduced to the agreed upon purchase price. Despite the Boldridges' protests, they maintained that they tried to make a payment in early 2002 but were told that NCM was no longer accepting payments on the mortgage loan.

On April 12, 2002, NCM brought an action to foreclose its mortgage on the property against the Rosses and the Boldridges, asserting that the Rosses had defaulted on their mortgage loan in December 2001.

On August 11, 2003, the Boldridges filed a third-party petition against the Tumbergers, the Rosses, and NCM. The Boldridges sought a judgment for damages from the Tumbergers. They contended that they had been deprived of the use of their equity in the property as a result of the resale of the property to the Rosses and the Rosses' execution of a mortgage to NCM. They sought to have the deed to the Rosses and the mortgage to NCM voided. They also requested that the title to the property be quieted in their names in fee simple.

In December 2003, Kevin Ross had several conversations with Linda Mock, the attorney who filed the original foreclosure petition. Ross admitted to Mock that it was his signature on the note, mortgage, and loan application. Nevertheless, he explained that other documents included with the loan application were false. Ross told Mock that the W-2 form included with the loan application was false. According to Mock, after she showed Ross the form, he commented, "I never worked for those people, and I never made that much money in my entire life." Ross further told

Mock that he recognized the company listed on the form as one that was owned by Kostelec and Matthew Tumberger. Ross explained that Kostelec had approached him at a construction site where he worked and asked him if he would be willing to purchase a piece of property in his name and in a couple of months the property would be moved out of his name. Kostelec told him they were trying to help someone who wanted to purchase a house but could not obtain financing on their own.

Before trial, in settlement and payment of the Boldridges' claim against the Tumbergers, the Tumbergers agreed to relinquish their title and interest in the property and executed a quitclaim deed for the property to the Boldridges.

After previously denying the parties' competing summary judgment motions, the trial court held a bench trial to consider NCM's petition and the Boldridges' third-party petition. The trial court requested the parties submit suggested findings of facts and conclusions of law.

The trial court adopted the findings of fact submitted by the Boldridges except for the amount of equity the Boldridges claim they were deprived of due to the reselling of the property. The court concluded that "[a]lthough the Boldridges made a claim based on the loss of use of equity at trial, creditable evidence supporting the claim was lacking and the evidence offered was highly speculative." The trial court, however, concluded that the Boldridges' possession of the property was notice to all persons as to whatever title or interest they had in the property.

Additionally, the trial court determined that the NCM had a valid first lien on the property and that the Rosses had made, executed, and delivered to NCM a valid mortgage which was now in default. The court also decided that the title to the property should be quieted in favor of the Boldridges. The court further determined that the Rosses were never the legal owners of the property. The court recalculated the amount due under the mortgage to be $173,201.05, plus interest. The court based this calculation on the following: "$173,685.00 of the loan proceeds benefitted the Boldridges, equitable principles require under the unusual facts of this case that the face amount of the mortgage be limited to

$173,685.00, less the amount paid toward the reduction of the mortgage of $483.95 or to $173, 201.05." Finally, the court ordered that NCM's mortgage be foreclosed. Nevertheless, the court determined that the sale of the property should be stayed provided the Boldridges resume payments under the revised note. In addition, the court determined that the reinstatement balance of $74,262.12, plus interest, would be a further lien on the property, becoming due and payable following the payment of the principal balance.

*Standard of Review*

Commonly, when a trial court makes specific findings of facts and conclusions of law the function of an appellate court is to determine whether the trial court's findings of fact are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusions of law, over which an appellate court has unlimited review. *Nicholas v. Nicholas*, 277 Kan. 171, 177, 83 P.3d 214 (2004); *U.S.D. No. 233 v. Kansas Ass'n of American Educators*, 275 Kan. 313, 318, 64 P.3d 372 (2003). In this case, aside from making specific findings of facts and conclusions of law, the trial court ultimately employed an equitable doctrine. "[T]he application of an equitable doctrine rests within the sound discretion of the trial court. [Citation omitted.]" *Bankers Trust Co. v. United States of America*, 29 Kan. App. 2d 215, 218, 25 P.3d 877 (2001).

In proper cases, equity will protect one lending money secured by a mortgage to pay an existing valid lien. Quoting from *Everston v. Central Bank*, 33 Kan. 352, 6 Pac. 605 (1885), our Supreme Court in *Newcomer v. Sibon*, 119 Kan. 358, 361, 239 Pac. 1110 (1925), stated:

" 'Where money is loaned upon the security of what is supposed to be a valid mortgage, but which in fact is a forged and void mortgage, and the money is so loaned for the purpose that a prior valid mortgage may be discharged, which is done, the mortgagee of the void mortgage may be subrogated to the rights of the prior mortgagee, there being no intervening liens or incumbrances.' [Citation omitted.]"

Subrogation is the "substitution of another person in the place of the creditor so that the person in whose favor it is exercised succeeds to the right of the creditor in relation to the debt. [Citation omitted.]" *Hartford Fire Ins. Co. v. Western Fire Ins. Co.,* 226 Kan. 197, 206, 597 P.2d 622 (1979). There are two types of subrogation—conventional subrogation, which arises out of an agreement between parties, and legal or equitable subrogation. 226 Kan. at 206. The doctrine of equitable, or legal, subrogation " 'is a creature of equity invented to prevent a failure of justice, and is broad enough to include an instance in which one party is required to pay what is, between them, the debt of another. . . . [It] is founded upon principles of natural justice.' [Citations omitted.]" *United States Fidelity & Guaranty Co. v. First State Bank,* 208 Kan. 738, 749, 494 P.2d 1149 (1972). In the present case, although the trial court did not specifically refer to this doctrine, it employed the doctrine of equitable subrogation when it foreclosed on the mortgage established between NCM and the Rosses but stayed the sale of the property provided the Boldridges resumed payments under the revised note creating a lien against the property.

The Boldridges argue that the trial court did not have any basis in law or equity to enforce NCM's mortgage. Relying on *Bankers Trust* they argue that "equity will not afford a party relief who negligently takes a lien or interest in property which is subject to prior interest of which that party has actual or constructive notice." NCM, on the other hand, argues that subrogation was just and equitable under the circumstances, pointing to the fact that the Boldridges failed to protect their interests by recording their contract for deed and that the Tumbergers perpetrated a fraud on both NCM and the Boldridges. Moreover, NCM argues that voiding the mortgage would result in a windfall to the Boldridges who would receive title without having to pay full value, because the previous valid mortgages were paid off using funds from the NCM's mortgage loan.

The Boldridges' reliance on *Bankers Trust,* however, is misplaced. In *Bankers Trust,* Dale and Marsha Latham entered into a contract for a deed with the Lechtenbergs to purchase real estate in 1986 and then later assigned their interest in the contract for

deed to the Peoples National Bank and Trust to secure a loan for $50,000, which was recorded on September 17, 1992. On December 1, 1992, the Internal Revenue Service (IRS) filed a tax lien against Dale Latham. In May 1993, the United States obtained a judgment against Latham and in June 1993, an abstract of the judgment against Latham was filed.

"On January 23, 1997, Dale Latham filed a waiver of marital interest in which he purported to transfer his interest in the real property" to his wife, Marsha. 29 Kan. App. 2d at 216. "Also on that day, the Lechtenbergs recorded a warranty deed which transferred the property to Marsha." 29 Kan. App. 2d at 216. At the same time, Marsha "executed a promissory note and mortgage, covering the real estate in favor of Quality Mortgage U.S.A., Inc." 29 Kan. App. 2d at 216. The proceeds were used to satisfy a prior mortgage held by the Lechtenbergs, to fully satisfy the contract for deed; partially satisfy the prior assignment of interest to Bankers Trust, to satisfy an IRS tax lien against Marsha Latham; and for closing costs. "Either on or prior to the date of closing, Quality Mortgage obtained a title insurance policy" reflecting the United States' judgment lien. 29 Kan. App. 2d at 217. That same day, Bankers Trust bought the Marsha Latham promissory note and mortgage from Quality Mortgage.

Marsha Latham eventually defaulted on the mortgage, and Bankers Trust brought an action to foreclose the mortgage. The United States was named as a defendant to the action, and it claimed "a priority lien on the one-half interest in the property that was held by Dale Latham prior to the entry of judgment against him in 1992 which he subsequently transferred to Marsha Latham." 29 Kan. App. 2d at 217. The trial court applied equitable subrogation and ordered that Bankers Trust be given priority over the United States upon the sale of the property, leaving the United States without hope of recovery because the Bankers Trust's mortgage exceeded the sale value of the property.

In determining that the trial court abused its discretion by applying the doctrine of equitable subrogation, this court stated:

"We hold the doctrine of equitable subrogation may not be applied to relieve a party who negligently takes a lien on or an interest in property which is subject

to prior liens of record of which that party had either actual or constructive notice." 29 Kan. App. 2d at 222.

The appellate court further stated that "[i]t is difficult to understand why any bank would take a lien on property knowing that it was encumbered by a prior judgment lien which had been of record for approximately 5 years." 29 Kan. App. 2d at 221.

The *Bankers Trust* court relied on *Kuhn v. Bank,* 74 Kan. 456, 458, 87 Pac. 551 (1906). In *Kuhn,* our Supreme Court declared that it was "negligence for a purchaser of either real or personal property to make the purchase without ascertaining the facts shown by the records which may affect the title to be acquired." 74 Kan. at 458.

Both *Bankers Trust* and *Kuhn* are concerned with the rule that one purchasing or taking an interest in real property is charged with constructive notice of all instruments recorded of which he or she could have acquired actual notice by an examination of the record. See *Harms v. Burt,* 30 Kan. App. 2d 263, 267, 40 P.3d 329, *rev. denied* 274 Kan. 1111 (2002). Here, when NCM made the loan and accepted the mortgage, there was no contract for deed of record. For example, if NCM had examined the record in the register of deeds' office of Johnson County, or if it had examined a properly prepared abstract of title, NCM would not have acquired actual knowledge of the existence of the Boldridges' contract for deed. As a result, *Bankers Trust* and *Kuhn* are inapplicable to this case.

Although not cited by the Boldridges, *Harms,* which followed *Bankers Trust* and *Kuhn,* is also distinguishable from this case. In *Harms,* three lawsuits resulted in two separate judgments entered on record against Veva Burt. The first was recorded in favor of the Harms in February 1999. The second was recorded in favor of the McMullins in October 1999. At the time the judgments were entered and recorded, Burt owned property which was subject to two mortgages. On November 7, 1999, the Wrights made an offer to purchase Burt's residence. On December 8, 1999, a title company prepared a title commitment which did not show the Harms' and McMullins' judgment liens on the property because although the

examiner checked company records, he did not check original records or recorded pleadings.

On December 16, 1999, a writ of execution was filed on the Harms' judgment against the property. The following day a settlement was agreed to that would release the two prior mortgages if the sale closed by December 31, 1999. On December 18, 1999, Burt accepted the Wrights' offer, and on December 21, 1999, the Wrights applied for a mortgage from Capital Federal and the sale closed on December 29, 1999.

Also on December 29, 1999, the sheriff received an "Order For Sale" on the property but returned the order on January 31, 2000, reporting that Burt was not found and was no longer a resident at the address provided. "Sixty days later, Burt filed a Chapter 7 bankruptcy petition in Texas." 30 Kan. App. 2d at 266.

On April 11, 2000, the Wrights received written notice that the judgment liens previously entered against Burt remained unsatisfied. When the Wrights failed to respond, the Harms filed a writ of general execution on August 4, 2000, and 3 days later a "writ declaring the property seized by the district court was posted" at the residence. The trial court allowed the Wrights and Capitol Federal to intervene in the execution proceedings. The Harms moved to determine lien priorities.

The trial court applied the doctrine of equitable subrogation determining the interests of Capitol Federal and the Wrights were superior to the judgment liens. It prohibited the Harms from proceeding with levy on the residence.

This court found that the trial court erred by applying the doctrine of equitable subrogation. Determining that the Wrights and Capital Federal had constructive notice, this court noted that "[i]n Kansas, courts charge parties with constructive notice of public records. [Citation omitted.] The judgment docket places parties and their agents who use reasonable care and diligence on notice of potential title problems. [Citation omitted.]" 30 Kan. App. 2d at 267-68.

*Harms* is distinguishable from the present case because it involved judgment liens which were recorded. Unlike this case, the Boldridges never recorded their contract for deed.

The Boldridges cite *Gray v. Zellmer*, 66 Kan. 514, 72 Pac. 228 (1903), as a case they maintain is analogous to the present case. In *Gray*, our Supreme Court refused to apply an equitable doctrine to enforce a mortgage obtained by the party listed on the deed without the consent of the party who was in open and notorious possession of the property. Koch purchased land for $560, paying $60 in cash and obtaining a mortgage for the remaining $500. The land was then transferred into Zellmer's name with Koch's consent, but Koch took possession and held it openly and notoriously. When the Koch mortgage came due, Zellmer obtained a mortgage for $300 from Ambler, which was used to discharge the Koch mortgage. Ambler trusted the title as shown in the records and made no inquiry into Koch's possession. The trial court refused to subrogate Koch for Zellmer. Instead, it granted a personal judgment against Zellmer but refused foreclosure against Koch.

In affirming this decision, our Supreme Court refused to substitute Koch as the debtor when the mortgage was obtained without Koch's "knowledge, consent, or procurement, but solely by the fraud of Zellmer." The court determined subrogation was inappropriate under the circumstances. The court reasoned that equitable doctrines should not be used "in favor of one who has knowledge of another's rights [and] has convenient and available means of obtaining such knowledge." 66 Kan. at 516-18.

Nevertheless, in *Newcomer*, our Supreme Court recognized subrogation as an appropriate measure and disapproved of "[t]he language used by the court in *Gray v. Zellmer* so far as inconsistent with this conclusion." 119 Kan. at 361. The *Newcomer* court determined that a party who makes a loan based on a forged real estate mortgage is entitled to subject the land to the repayment of any part of the money used to discharge valid liens even when the valid titleholder is innocent of the forgery. 119 Kan. at 361-62.

In *Newcomer*, a husband obtained a mortgage loan from a loan company, using property owned by his wife by forging her name and the name of a grantee in a deed from her. Part of the money lent was used in paying off liens on the property. The mortgages were later adjudged to be forgeries. Successors-in-interest of the loan company brought an action on the principle of subrogation to

subject the property used to secure the forged mortgages to the payment of the portion of the money lent that was used to discharge prior mortgage and tax liens on that property. They argued any other remedy they might have otherwise had was cut off by a decree quieting the wife's title rendered in the actions to foreclose the forged mortgages. Our Supreme Court determined that the loan company's successors were entitled to recover under the doctrine of subrogation. 119 Kan. at 359-61.

*Notice*

The Boldridges maintain that their undisputed possession of the questioned property gave constructive notice to NCM of the Boldridges' rights under their contract for deed. The general rule is that possession of land is notice to the world of whatever rights the possessor may have in the property. See *Gray v. Zelmer*, 66 Kan. at 516.

Under the facts of this case, the trial court determined that NCM had both constructive and actual notice "of the Boldridges' prior equitable title and ownership in the property under the contract for deed." In addition, the trial court determined that NCM's "lack of care . . . was the primary contributing factor and exceeded the lack of care of the Boldridges."

*Subrogation*

The Boldridges argue that the doctrine of subrogation is inapplicable in this case because of their undisputed possession of the property and because of the negligence on the part of NCM in failing to investigate or inquire about their possession of the premises.

Before addressing the subrogation issue, we need to consider a holding made by the trial court. The trial court determined that the Rosses had signed a valid mortgage to NCM. The trial court's conclusion, however, is inconsistent with its holding that the Rosses were never the legal owners of the property. Black's Law Dictionary 1009 (6th ed. 1990), defines the word mortgage as "an interest in land created by written instrument providing security for the performance of a duty or the payment of a debt."

Black's Law Dictionary further defines a mortgagor as "[o]ne who, having all or some part of title to property, by written instrument pledges that property for some particular purpose such as security for a debt." Black's Law Dictionary 1012 (6th ed. 1990). Because the Rosses were never the legal owners of the property, they could not have executed a valid mortgage to NCM. Even though the Rosses delivered an invalid mortgage to NCM, NCM may still seek to be subrogated to the rights of the two prior mortgages.

In *Crippen v. Chappel*, 35 Kan. 495, 496-99, 11 Pac. 453 (1886), an administrator borrowed money to pay off a mortgage on property belonging to an estate and as security signed a mortgage. The mortgage was determined to be invalid for lack of power in the administrator to execute it. In determining that the mortgagees under the invalid mortgage were not mere volunteers, our Supreme Court stated that the mortgagees were entitled to be subrogated to the rights of the original mortgagee.

Explaining that the doctrine of subrogation is based on the theory of unjust enrichment, the *Crippen* court stated:

"[T]he right of subrogation or of equitable assignment is not founded upon contract alone, nor upon the absence of contract, but is founded upon the facts and circumstances of the particular case and upon principles of natural justice; and generally, where it is equitable that a person furnishing money to pay a debt should be substituted for the creditor or in the place of the creditor, such person will be so substituted."

The Boldridges received the benefit of NCM's loan to the Rosses— the payment of the two prior mortgages which had priority over their contract for deed. The Boldridges have not been required to change their position because of the satisfaction of the two prior mortgages. See *Federal Land Bank v. Hanks,* 123 Kan. 329, 339, 254 Pac. 1040 (1927) ("They are substantially in the same situation as they were before the change in the form of the indebtedness was made, and hence there can be no equitable reason why the mortgagee in the new mortgage should not be subrogated to the rights of the mortgagees in the old mortgages.").

As a result, any negligence on the part of NCM in failing to make an adequate inquiry as to the possession of the premises by the

Boldridges does not bar NCM from the right of subrogation. The doctrine of subrogation is designed to promote natural justice. As stated previously, to permit NCM to assert the rights of the two preexisting valid mortgagees against the Boldridges would not prejudice the Boldridges' interests. As a result, the trial court did not abuse its discretion in granting subrogation in this case.

Affirmed.